State                              :

v.                                 :

Gerrit Musterd.                    :

NOTICE:    This opinion is subject to formal revision before
publication in the Rhode Island Reporter.  Readers are requested to
notify the Opinion Analyst, Supreme Court of Rhode Island,
250 Benefit Street, Providence, Rhode Island 02903, at Telephone
222-3258 of any typographical or other formal errors in order that
corrections may be made before the opinion is published.

State               :

v.             :

Gerrit Musterd.       :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court**.  The defendant, Gerrit Musterd, appeals from a Superior Court judgment of conviction for first-degree murder and three related crimes.  On appeal, Musterd argues that the trial justice erred in denying his pretrial motions to suppress evidence; he also contends that the trial justice improperly denied his motions for a new trial and for a judgment of acquittal.  After reviewing the record and considering the parties' written submissions and oral arguments, we discern no error on the part of the trial justice and affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

On September 2, 2009, Officer John Brown of the Pawtucket Police Department responded to Newell Avenue in Pawtucket to investigate a call regarding "a black male that was sleeping or slumped over in a vehicle."  Upon arrival at the scene, Officer Brown saw a vehicle with the bloodied body of a black male inside.  There appeared to be a bullet wound in the back of the victim's head.  Shortly thereafter, a rescue captain determined that the man was dead.  Officials later identified the decedent as Michael Benson.  Benson had recently been released

from prison, and when his body was found, he was wearing an electronic monitoring ankle bracelet.  At the time his body was discovered, a detective found marijuana in the back of his vehicle.  Two days later, on September 4, 2009, police searched Benson's home pursuant to a warrant and recovered about $72,000 in cash.

Several days later, on September 13, 2009, a woman who identified herself as "Dawn" called the police department and notified a dispatcher that she had information concerning the recent murder.[1]  Sergeant Dennis Lefebvre returned her call several minutes later.  The woman identified herself as Dawn Edmonds and told Lefebvre that she knew who had committed the murder.  She gave Lefebvre certain information about that individual, such as his physical description, where he worked, what kind of car he drove, and his cell phone number.  She said that although she knew the man as "Joe," she was unsure of his exact name.  Edmonds informed Lefebvre that in August and September of 2009, she was living with Nicole Meireles, whose boyfriend was Gerrit Musterd—the man Edmonds knew as Joe Rodrigues.[2]

Edmonds's criminal history was reviewed in some detail at trial, both on direct examination and cross-examination.  She testified that, when she contacted Officer Lefebvre, she told him that she had a warrant out for her arrest and was concerned about going to jail. Edmonds had several pending charges against her when she contacted the police department. She later resolved those charges and entered into a cooperation agreement with the Attorney General.

At trial, Edmonds testified that, in August 2009, Musterd asked her if she could get him some black sweatpants and gloves, explaining that he needed to "handle something."  When she

---

[1] The transcript reveals that the prosecutor initially identified the date in question as September 13, 2010 (not 2009), but later corrected his mistake.

[2] As we note below, Musterd later told police that "Joe Rodrigues" was his alias.  For simplicity's sake, we will identify him as Musterd throughout the remainder of this opinion.

later asked him if he had handled what he needed to, Musterd told her that he was "waiting on a gun." Musterd then told her that "Joey," who owned the gym where he worked, would provide him with a gun. Edmonds testified further that, on some later date, Musterd asked her if she had watched the news.[3] When she replied that she had not, he told her: "I did it. I handled it. I put two bullets into him. * * * He's dead." Edmonds described Musterd's demeanor that day as "nervous" and "shaken up." Musterd told Edmonds that his boss, Joey, had paid him $5,000 for the murder and that he had purchased a blue Buick Century with the money.[4]

On September 14, 2009, Edmonds went to the police department and gave a statement to detectives that memorialized what she had told Lefebvre the day before. The detectives then asked her to call Musterd's cell phone. Although that call did not yield any information, Musterd called the police station three times that day after Edmonds called him—perhaps curious about why Edmonds had called him from the police department. Recordings of those calls were played for the jury at trial,[5] and a detective testified that the caller identified himself as Gerrit Musterd. During these conversations, Musterd told the police that he worked at a gym and was an undocumented immigrant from the Netherlands. He told them that he was living as "Joe Rodrigues" because that was the name his birth parents gave him. He also told them his date of birth and his telephone number.

The officers next asked Edmonds to attempt to capture an in-person conversation with Musterd using a hidden recording device. She agreed to do so, and on September 17, 2009,

---

[3] The record does not reflect exactly when this conversation occurred, but we presume any conversation on this subject would have taken place on September 2, 2009, or shortly thereafter, when the murder would have been reported by local news media.

[4] As we note below, Musterd later told police that his boss, Julio Reverdes, asked him to murder Benson because Reverdes owed Benson a debt for drugs.

[5] Although the trial transcript suggests that transcripts of all three calls were collectively marked as a trial exhibit, the record contains the transcript of only one phone call.

Edmonds brought a recording device with her to the gym where Musterd worked. Edmonds and Musterd had a conversation outside the gym, and detectives observed this encounter from a distance.[6] Edmonds went back to the police station to return the recording device. Moments later, Musterd's vehicle pulled up outside. He yelled to her, asking her what she was doing there. Feeling nervous, she replied that she was seeing probation officials about a court date, went inside, and gave a detective the recording device.

Shortly thereafter, detectives directed that Musterd be stopped and arrested. Police arrested Musterd at about 2 p.m. He was interviewed at the station shortly after 5 p.m. that afternoon. After several hours of questioning, Musterd gave a statement to the police in which he confessed to the murder. Musterd explained that his boss at the gym, Julio Reverdes, whom he knew as "Joey," had asked him to kill Benson because Reverdes owed Benson a debt for drugs.[7] The next day, on September 18, 2009, Musterd signed a waiver of his right to prompt presentment to court under Rule 5(a) of the Superior Court Rules of Criminal Procedure and accompanied police officers to Boston so that he could point out the spot on the shoreline adjacent to a body of water where he told them he had discarded the murder weapon.[8]

In October 2009, a grand jury indicted Musterd on charges of first-degree murder in violation of G.L. 1956 § 11-23-1 (count 1), discharging a firearm during the commission of a crime of violence in violation of G.L. 1956 §§ 11-47-3.2(a) and 11-47-3.2(b)(3) (count 2),

---

[6] Edmonds testified that Musterd was the person with whom she spoke outside the gym, and a detective testified that he observed Edmonds exit the gym and converse with a person who met Musterd's description.

[7] Julio Reverdes (whose last name is spelled in the record alternately as "Riverdes") was not named in the indictment, but the indictment refers to an unnamed, unindicted coconspirator. In instructing the jury, the trial justice referred to Reverdes as Musterd's coconspirator.

[8] A dive team conducted a search of the area but did not recover a firearm.

conspiracy to commit murder in violation of G.L. 1956 § 11-1-6 (count 3), and carrying a pistol without a license in violation of § 11-47-8(a) (count 4).

Over the course of a four-day trial, the prosecution presented fifteen witnesses who testified to the facts summarized above.[9]  After the trial concluded, a jury convicted Musterd on all counts.  The trial justice subsequently denied Musterd's motion for a new trial.  On July 28, 2010, the trial justice sentenced Musterd to life sentences for murder (count 1) and discharging a firearm during the commission of a crime of violence (count 2).  The trial justice also imposed sentences of ten years to serve for conspiracy to commit murder (count 3) and carrying a pistol without a license (count 4).  All four counts of the sentence were to be served consecutively.  Musterd timely appealed his conviction to this Court.

## II

## Issues on Appeal

On appeal, Musterd contends that the trial justice committed three errors of law.  First, Musterd submits that, because the police lacked sufficient probable cause to arrest him without a warrant, the trial justice should have granted his motion to suppress his confession and any evidence seized as the fruits of an illegal arrest.  Second, he argues that, because the Pawtucket police failed to properly present him in court, and because they engaged in "trickery and lying" during his interrogation, the trial justice should have granted his motion to suppress his

---

[9] In addition to Dawn Edmonds and several law enforcement officers, the state's witnesses included: Lisa McCarty, Benson's common-law wife; Dr. William Cox, a medical examiner; James Leite, the individual from whom Musterd bought a Buick with the money he earned from the murder; Peter DiLorenzo, a mixed martial arts promoter who knew both Musterd and Reverdes; Sharon Turner, a parole officer who was monitoring Benson before his death; Brian Canavan, an officer in the Ballistics Unit of the Massachusetts State Police; and Megan Murasso, a firearms and toolmark examiner employed by the Connecticut Department of Public Safety.

confession. Finally, he argues that the trial justice erred in denying his motions for a judgment of acquittal and for a new trial. This Court will address each of Musterd's arguments in turn.

# III

# Discussion

## A

## Motion to Suppress—Probable Cause

### 1

### Standard of Review

When this Court reviews the denial of a motion to suppress, "we defer to the trial justice's factual findings" and accept those findings unless they are clearly erroneous. State v. Ortiz, 824 A.2d 473, 479 (R.I. 2003) (citing State v. Apalakis, 797 A.2d 440, 443 (R.I. 2002)). "In reviewing a probable-cause-to-arrest determination, however, we engage in a de novo review of the ultimate conclusion because this type of ruling involves a mixed-law-and-fact analysis that implicates constitutional rights." Id. at 479-80 (citing State v. Guzman, 752 A.2d 1, 3 (R.I. 2000)). "Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a reasonable person's belief that a crime has been committed and that the person to be arrested has committed the crime." State v. Kryla, 742 A.2d 1178, 1182 (R.I. 1999) (quoting State v. Jenison, 442 A.2d 866, 873-74 (R.I. 1982)).

### 2

### Analysis

The trial justice denied Musterd's motion to suppress evidence, including his confession, finding that sufficient probable cause existed to support his arrest without a warrant. At the

hearing on the motion, the prosecution presented three witnesses (two of whom also testified at trial). Their cumulative version of the facts was consistent with the trial testimony described above.[10] The trial justice stated that he had "no question" that probable cause existed to support Musterd's arrest on September 17, 2009.

After reviewing the record and taking into account all the circumstances surrounding Musterd's arrest, this Court is of the opinion that the trial justice properly denied the motion to suppress. As of September 2, 2009, the police knew that someone had murdered Michael Benson. Less than two weeks later, Edmonds called the police and told them that she knew who had committed the murder. Edmonds revealed several details about Musterd, whom she knew as Joe Rodrigues. She also told them that he had made incriminating statements to her. According to a detective who testified at the pretrial hearing, Edmonds told the police a detail about Benson's murder that had not been released publicly.[11] On September 14, 2009, Edmonds called Musterd from the police station; and, although that call failed to yield any information related to the crime, officers learned more about him when he later called the police station. They learned that his name was Gerrit Musterd, that his alias was Joe Rodrigues, and that he was an undocumented immigrant. A few days later, on September 17, 2009, officers observed Edmonds meet with a man who fit Musterd's description (Edmonds had described him as a black male); they met at the gym where Edmonds said he worked, and he was driving a blue Buick Century, as Edmonds described. After this meeting, Edmonds drove to the police station to return the recording device, and moments later, Musterd arrived there and confronted her. Officers arrested him shortly thereafter.

---

[10] No testimony was offered on events that occurred after Musterd was arrested, however.
[11] Specifically, she told them that Musterd had told her he shot the victim twice.

These circumstances lead us to conclude that, when the police arrested Musterd, probable cause existed to take him into custody without a warrant. Edmonds's information about Musterd, coupled with Musterd's own statements and actions, furnished ample reason to believe that he was responsible for the murder of Michael Benson. Concluding that probable cause existed to support Musterd's arrest, we perceive no error on the part of the trial justice in denying the motion to suppress for that reason.

We now turn to Musterd's two additional arguments supporting his motion to suppress. Regardless of whether probable cause existed to support his arrest, he contends that, because the Pawtucket police failed to properly present him in court, and because they engaged in "trickery and lying" during his interrogation, the trial justice should have granted his motion to suppress his confession and evidence derived from it.

**B**

**Motion to Suppress—Confession**

**1**

**Standard of Review**

"When ruling on a motion to suppress a confession, the trial justice should 'admit a confession or a statement against a defendant only if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in <u>Miranda v. Arizona</u>.'" <u>State v. Barros</u>, 24 A.3d 1158, 1179 (R.I. 2011) (quoting <u>State v. Bido</u>, 941 A.2d 822, 835 (R.I. 2008)). We employ "a two-step analysis" in reviewing such a ruling. <u>Id.</u> (quoting <u>State v. Taoussi</u>, 973 A.2d 1142, 1146 (R.I. 2009)). First, we defer to the trial justice's findings of historical fact concerning the voluntariness of the confession unless those findings are clearly erroneous. <u>Id.</u> (citing <u>Taoussi</u>,

973 A.2d at 1146).  Second, we "apply those historical facts and review <u>de novo</u> the trial justice's determination of the voluntariness of the statement."  <u>Id.</u> (quoting <u>Bido</u>, 941 A.2d at 836).

"[A] statement is voluntary 'when it is the product of [the defendant's] free and rational choice.'"  <u>State v. Robinson</u>, 989 A.2d 965, 974 (R.I. 2010) (quoting <u>State v. Humphrey</u>, 715 A.2d 1265, 1274 (R.I. 1998)).  If a statement was "extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant," it is involuntary.  <u>Id.</u> at 974-75 (quoting <u>Humphrey</u>, 715 A.2d at 1274).  When reviewing <u>de novo</u> the voluntariness of a confession, this Court considers "the totality of the circumstances surrounding the challenged statement."  <u>Robinson</u>, 989 A.2d at 975 (quoting <u>Humphrey</u>, 715 A.2d at 1274).  We must consider not only whether a defendant's statement was made voluntarily, but also whether it was made knowingly and intelligently—that is, "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>State v. Jimenez</u>, 33 A.3d 724, 734 (R.I. 2011) (quoting <u>State v. Leuthavone</u>, 640 A.2d 515, 519 (R.I. 1994)).

**2**

**Analysis**

Here, Musterd's motion to suppress is directed at the statement he gave to the police after he was arrested on September 17, 2009.[12]  At the suppression hearing, a detective testified that, on the day Musterd was arrested, he was brought to the police station at approximately 2 p.m.  He was then booked and processed over the course of thirty to forty minutes.  Before beginning

---

[12] The motion was not directed at the statements Musterd made when he called the police station before he was arrested.  In addition, defense counsel did not dispute the legality of the search of Musterd's car (conducted by officers after his arrest based on Musterd's signed consent form).

his interview shortly after 5 p.m., officers apprised him of his <u>Miranda</u> rights. They used a printed form, read Musterd his rights, and asked him whether he understood those rights. Musterd signed the waiver form, indicating that he understood his rights and that he wanted to speak with the police. According to the detective's testimony, when the police asked him if they could record his statement, Musterd replied that he would rather not be on tape and that he preferred the statement to be typed. Nevertheless, detectives videotaped a portion of the interview. The transcript of that videotaped portion indicated that Musterd reviewed his statement with detectives before they typed out a final version for his editing, approval, and signature. During this portion of the interview, Musterd explained in great detail why he committed the murder.[13]

The trial justice issued a bifurcated ruling with respect to the admissibility of Musterd's statement. First, he considered whether Musterd gave that statement knowingly and intelligently. The trial justice noted that Musterd was given a printed rights form, was orally apprised of his <u>Miranda</u> rights, and initialed that form to acknowledge his understanding of those rights. The trial justice rejected Musterd's argument that the surreptitious recording of his statement—after he had expressed a preference that it be typed rather than recorded—rendered that waiver unknowing and unintelligent. Accordingly, the trial justice concluded that Musterd had given his statement knowingly and intelligently.

Second, the trial justice considered whether Musterd's statement was voluntary. Musterd's counsel argued that it was involuntary for two reasons: first, because police had

---

[13] Musterd explained that his boss at the gym, Julio Reverdes, asked him to kill Benson because Reverdes owed Benson money and feared that Benson might kill him over the debt. Musterd knew that Reverdes was having money troubles, and he worried that he would be out of a job if Reverdes had to sell the gym. Musterd had himself borrowed money from Reverdes, so he felt obligated to commit the murder.

videotaped Musterd after he told them he did not want to give a videotaped statement; and second, because the police had delayed in presenting him to court. The trial justice rejected both of these contentions and ruled that Musterd had given his statement voluntarily. Having found that Musterd's statement was made knowingly, intelligently, and voluntarily, the trial justice denied Musterd's motion to suppress that statement.

We agree with the trial justice's conclusion that any delay in presentment did not affect the voluntariness of Musterd's statement to the police. When police officers make a warrantless arrest, Rule 5(a) of the Superior Court Rules of Criminal Procedure requires law enforcement officials to "take the arrested person without unnecessary delay before a judge of the District Court." "[T]his Court views Rule 5(a) as 'a prophylactic measure designed to prevent other constitutional infirmities.'" Barros, 24 A.3d at 1181 (quoting State v. King, 996 A.2d 613, 621 (R.I. 2010)). "[O]ur well-settled case law with respect to Rule 5(a) unambiguously indicates that a defendant who seeks to have an inculpatory statement suppressed because of an unnecessary delay in presentment 'must demonstrate both: (1) that the delay in presentment was unnecessary and (2) that such delay was "causative" with respect to' the making of the inculpatory statement." Id. at 1182 (quoting King, 996 A.2d at 622). Applying this test, the trial justice found that "the delay in no way affected the statements that [Musterd] gave."[14]

Likewise, we also agree with the trial justice's finding that the surreptitious recording of Musterd's statement, after Musterd had expressed a preference that officers memorialize his statement through typing and not recording, could not serve as a basis upon which to exclude it from evidence. At the suppression hearing, Musterd's counsel argued that the secret recording of

---

[14] The trial justice did not specifically address whether any delay in presentment was unnecessary; but, given that the trial justice found that any delay was not causative with respect to Musterd's statement, it was unnecessary for him to make a specific finding on this ground.

- 11 -

his statement to the police affected both prongs of the <u>Miranda</u> analysis; that is, whether the statement was voluntary <u>and</u> whether it was knowing and intelligent. The trial justice found that, notwithstanding the surreptitious recording, Musterd gave his statement knowingly, intelligently, and voluntarily.

We perceive no error with the trial justice's conclusion on either prong of the <u>Miranda</u> analysis. As to the first prong of the analysis, we are satisfied that Musterd knowingly and intelligently waived his rights. "[A] knowing and intelligent waiver may be executed when a defendant is apprised of the <u>Miranda</u> warnings, comprehends such warnings, and thereafter makes a voluntary statement." <u>Jimenez</u>, 33 A.3d at 735 (citing <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250, 2262 (2010)). The record supports the trial justice's conclusion that, since Musterd was advised of his rights, understood those rights, and then spoke to the police of his own accord, he knowingly and intelligently waived his <u>Miranda</u> rights.

As to the second prong of the <u>Miranda</u> analysis, we are similarly convinced that Musterd gave statements to the police "because [he] wanted to"—in other words, that his statements were voluntary. The trial justice characterized the interview as "a free-flowing dialogue that the defendant very much wanted to be a part of." The trial justice noted several cases from other jurisdictions in which courts found that statements of a defendant were given voluntarily even though police recorded those statements against the defendant's wishes.[15] Rhode Island precedent does not speak to this precise issue, but the United States Supreme Court has held that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely

---

[15] <u>See</u> <u>Woods v. McDonough</u>, No. 8:03-CV-2336-T-27MAP, 2007 WL 1017666, at *9 (M.D. Fla. Mar. 30, 2007); <u>Blake v. State</u>, 972 So.2d 839, 842-45 (Fla. 2007); <u>State v. Wilson</u>, 755 S.W.2d 707, 709 (Mo. Ct. App. 1988); <u>State v. Lewis</u>, 533 A.2d 358, 364 (N.H. 1987); <u>Hardin v. State</u>, 649 P.2d 799, 802 (Okla. Crim. App. 1982). Another case which the trial justice cited has since been reversed by a higher court. <u>See</u> <u>Lee v. State</u>, 975 A.2d 240, 255 (Md. Ct. Spec. App. 2009), <u>rev'd</u>, 12 A.3d 1238, 1251 (Md. 2011).

can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." Moran v. Burbine, 475 U.S. 412, 422 (1986). Because Musterd was unaware that the police were recording his statements, that fact has no bearing on whether he voluntarily waived his Miranda rights. Moreover, we note that Musterd did not expressly forbid police from recording his interview; rather, he merely expressed a preference that his statement be typed rather than recorded. In these circumstances, we decline to hold that Musterd's knowing, intelligent, and voluntary waiver of his Miranda rights was later vitiated when the police recorded a portion of his statement without his knowledge.

## C

### Sufficiency of the Evidence

Lastly, Musterd argues that the trial justice erred when he denied his motions for a judgment of acquittal and for a new trial. These motions challenged the legal sufficiency of the evidence. In deciding whether to grant a motion for a new trial, the trial justice may exercise his or her "independent judgment to weigh the evidence and assess the credibility of the witnesses." State v. Navarro, 33 A.3d 147, 156 (R.I. 2011) (quoting State v. Pineda, 13 A.3d 623, 640 (R.I. 2011)). By contrast, in ruling on a motion for a judgment of acquittal, the trial justice must "view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw[ing] therefrom all reasonable inferences consistent with guilt." Id. (quoting Pineda, 13 A.3d at 640). Where, as here, a defendant appeals the trial court's rulings on both types of motions, this Court first evaluates the ruling on the new-trial motion. Id. (citing Pineda, 13 A.3d at 640). If our review of the evidence adduced at trial shows that the evidence is sufficient to support a conviction under the standard applicable to a new-trial motion, it follows

that the trial justice did not err in denying the defendant's motion for a judgment of acquittal. See id. (citing Pineda, 13 A.3d at 640).

**1**

**Motion for a New Trial**

"When deciding whether to grant or deny a motion for a new trial, the trial justice acts as a thirteenth juror." Navarro, 33 A.3d at 156 (quoting Pineda, 13 A.3d at 640-41). "The trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting Pineda, 13 A.3d at 641). If the trial justice has set forth sufficient reasoning to support his or her ruling, this Court "accord[s] great weight" to that ruling on appeal. Id. (quoting Pineda, 13 A.3d at 641). We will not reverse the trial justice's decision unless "we are convinced that [he or she] committed clear error or * * * overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." Id. at 156-57 (quoting Pineda, 13 A.3d at 641).

To support his argument that the trial justice should have granted him a new trial, Musterd presses only one point. He contends that Edmonds's testimony on cross-examination indicates that her conversation with Musterd, in which he told her that he was looking for a gun, took place after the murder was committed.[16] This observation fails to take into account that her

---

[16] During this portion of Edmonds's cross-examination, Musterd's counsel referred Edmonds to the statement she gave to police on September 14, 2009. The following exchange then took place:

"Q: * * * So, I had asked you earlier about your statement in there about where you say about a week ago, you were home and that's when Joe told you about this. Correct? We spoke of that?
"A: Yes.

testimony on direct examination made clear that this conversation took place in August 2009, sometime after Musterd originally asked her for dark clothing but before the murder occurred on September 2, 2009. Given that Musterd's own statements corroborated Edmonds's account to the police, we cannot say that the trial justice committed clear error in finding that this inconsistency on cross-examination was outweighed by the rest of the evidence adduced at trial.[17]

The trial justice neither committed clear error nor overlooked or misconceived material or relevant evidence when he denied Musterd's motion for a new trial. We therefore affirm his ruling on this motion and turn to whether he properly denied Musterd's motion for a judgment of acquittal.

**2**

**Motion for a Judgment of Acquittal**

"We review a trial justice's denial of a motion for a judgment of acquittal using the same prosecution-deferential standard as the trial court applies." Navarro, 33 A.3d at 158 (quoting Pineda, 13 A.3d at 642). Under this standard, "[if the evidence] is sufficient to support a verdict of guilty beyond a reasonable doubt, the motion must be denied." Id. (quoting Pineda, 13 A.3d at 642). Since we hold that the evidence here is "sufficient to withstand the more stringent review applicable to a motion for a new trial, it follows that the evidence * * * [is] also sufficient

---

"Q: And then, later on in that same sentence of the document you just read and you signed, you said that he told you that he was waiting for a gun at that time, correct?

"A: Mm hmm." (Edmonds later made clear that her answer to the preceding inquiry was yes.)

[17] In denying Musterd's motion for a new trial, the trial justice noted that "Edmonds was subjected to lengthy and severe cross-examination and her credibility was fully tested. Her problems, both psychological and in criminal cases, were exposed, warts and all, and this jury obviously accepted her testimony as credible. And I, as a front-row observer, have no qualms about their having accepted her testimony as credible."

to withstand a motion for a judgment of acquittal." Id. (quoting Pineda, 13 A.3d at 642). Accordingly, we decline to disturb the trial justice's denial of Musterd's motion for a judgment of acquittal.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record of the case may be remanded to the Superior Court.


**TITLE OF CASE:** State v. Gerrit Musterd.

**CASE NO:** No. 2011-159-C.A.
(P1/09-3256AG)

**COURT:** Supreme Court

**DATE OPINION FILED:** November 2, 2012

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

For State: Christopher R. Bush
Department of Attorney General

For Defendant: C. Daniel Schrock, Esq.