June 11, 2019

**Supreme Court**

No. 2018-43-C.A.
(P1/16-2489A)

State                                    :

    v.                                   :

Hasim Munir.                             :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                         :

v.                        :

Hasim Munir.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Hasim Munir, appeals from a July 6, 2017 judgment of conviction entered against him in Providence County Superior Court following a jury trial.  Mr. Munir was charged by indictment with and subsequently convicted of one count of first-degree child molestation sexual assault, in violation of G.L. 1956 §§ 11-37-8.1 and 11-37-8.2.  On appeal, he raises the following issues: (1) "whether the trial justice committed clear error by refusing to suppress defendant's statement to the police where evidence that defendant's confession was knowing, intelligent and voluntary was less than clear and convincing;" and (2) "whether the trial justice committed clear error in admitting defendant's confession into evidence despite his invocation of his right to remain silent[.]"

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On August 25, 2016, Mr. Munir was charged by indictment with "engag[ing] in sexual penetration, to wit, penile to vaginal penetration, with * * * a person fourteen (14) years of age or under, in violation of §11-37-8.1 and §11-37-8.2 * * *." In due course, Mr. Munir's case proceeded to trial. Prior to the start of the trial, defendant moved to suppress "any and all statements" he made to the police officers who interrogated him after taking him into custody on May 7, 2015.[1] He contended that those statements were "obtained by the Police in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution [and] Article I, Section 6, of the Rhode Island Constitution, and they are therefore barred as admissible evidence under RIGL § 9-19-25." A suppression hearing was held with respect to defendant's motion.

## A

### The Audio Recording of the Interrogation at Issue

Before delving into the testimony at the suppression hearing, we deem it necessary for the sake of clarity to review some of what occurred during the custodial interrogation, especially those portions thereof with which defendant takes issue on appeal. An audio recording of the interrogation was played in its entirety for the trial justice at the suppression hearing and has been listened to in its entirety by this Court.[2] It was also played in its entirety for the jury at trial. The parties do not dispute what occurred during that interrogation, but they do disagree as to the effect which what occurred may have had on defendant's exercise of his free will.

---

[1]   The record reflects the fact that Mr. Munir filed a motion to suppress *pro se* and that a second motion to suppress was later filed on Mr. Munir's behalf by his appointed counsel.

[2]   We note that we also have the benefit of a transcript of the audio recording, which was part of the record presented to us, having been entered as an exhibit for identification at trial.

The audio recording reveals that the interrogating detectives frequently used vulgarity and sometimes raised their voices to defendant. Moreover, they subjected him from time to time to what fairly can be characterized as a barrage of questions. It should also be noted that, throughout the interrogation, Mr. Munir had his left hand handcuffed against the wall of the interrogation room.

During the course of the interrogation, the detectives represented to Mr. Munir that his DNA might be found on portions of the victim's body, and they actually stated that a DNA sample was at the Department of Health at that moment—despite the fact that it is undisputed that no DNA had been found. At another point in the interrogation, as defendant states in his brief before this Court, "the detectives pretended to be handcuffed to each other to pantomime the defendant in the position of being handcuffed to another defendant and led before a judge where it would become known that he had requested to know the results of the DNA test." The defendant alleges that that pantomime was also meant to intimidate defendant by suggesting that other prisoners would find out that he was charged with child molestation.

Importantly, defendant was asked by one of the detectives: "Do you have anything else you want to say? Did you do it?" The defendant responded: "I don't -- I have nothing else to say." Also of note is the fact that, during the course of the interrogation, the police suggested to Mr. Munir that, if he believed that the victim was sixteen, "in the eyes of the Court" that would not be "frowned upon;" and they also told him that, if he "thought she was 16," "[t]he State of Rhode Island says, yes."

At the start of the interrogation, defendant denied having molested the underage victim. However, at the end of the approximately one and a half hour interrogation, defendant ultimately

confessed to having sexually molested the victim, although he said that he did not believe that there had been penetration.

We now proceed to relate the salient testimony adduced at the suppression hearing.

**B**

**The Suppression Hearing Testimony**

Detective Christopher Rotella was the only person to testify at the suppression hearing. It was his testimony that, as a member of the Providence Police Department, he had served as a "sex crimes detective" for approximately eight years. He testified that an arrest warrant for Mr. Munir was effectuated on May 7, 2015. Detective Rotella added that, before talking with Mr. Munir on that date, he enlisted the assistance of Detective Joseph Hanley and they proceeded to the cell block, where Det. Rotella read Mr. Munir his rights and asked if he would like to speak to the detective. It was Det. Rotella's testimony that Mr. Munir agreed to speak with the detectives, so he escorted Mr. Munir to an "interview room or interrogation." Detective Rotella testified that he then read Mr. Munir's rights to him a second time and that Mr. Munir signed the "rights form."

The audio tape of the full interrogation was then played for the trial justice at the suppression hearing. After the audio recording was played, Det. Rotella was asked by the prosecutor why he used vulgar language during the interrogation. He stated that "[i]n this particular case it's just a matter of getting the person to feel comfortable, getting down to not necessarily their level, but discussing the situation to make them feel the most comfortable." When asked if he threatened Mr. Munir in any way, Det. Rotella responded in the negative. He added that, except for handcuffing Mr. Munir to bring him to the interview room, neither he nor Det. Hanley "put his hands" on Mr. Munir.

- 4 -

On cross-examination, Det. Rotella was asked to describe his training in conducting interrogations. It was his testimony that he had been trained in the Reid technique, and he stated that "the Reid format is where you mirror the suspect or you develop a rapport with the suspect."

Detective Rotella further testified on cross-examination that he was aware when he interrogated Mr. Munir that there were no "physical findings" in the case. He added that, "[w]hile I was speaking with him, I could tell the way he was answering me that he probably had more to say." He further stated:

> "[T]here was a couple times during that interview I would ask him a question, and he would pause because I was almost done and ready to end the interview on a couple of occasions during that interview. However, because of his reaction to my questions or his facial expressions, that's why I continued."

Detective Rotella further testified on cross-examination that part of the Reid technique consists of "press[ing]" the suspect for an answer when he or she does not remember something. Detective Rotella added that he had used a tactic where he started to discuss the existence of DNA evidence, but he pointed out that he never actually told Mr. Munir that the police had his DNA. However, Det. Rotella also conceded on cross-examination that the interrogation was "a little chaotic * * *."

Lastly, Det. Rotella was asked on cross-examination about the pantomime which he and Det. Hanley performed during the interrogation of defendant—which pantomime portrayed one prisoner being handcuffed to another prisoner and brought before a judge. Regarding that pantomime, Det. Rotella stated that its purpose was not to intimidate defendant. Rather, he stated, it had been done only to "give him an example of what it would look like when he's standing in front of a judge saying, 'We're going to wait for the DNA,' but he doesn't want to tell me whether or not we're going to find it in her vagina." He added that he performed that pantomime because

"[w]hen you get arraigned and you're standing in front of a Judge, as I know for 20 years, the prisoners ordinarily don't come up one at a time. They come up handcuffed to each other. That's not something that I created. That's something that's part of the process."

We note as well that, when asked by the trial justice whether there had been the capability to videotape the interrogation, Det. Rotella stated that the video recording system was "not operable at that time." He added that he was not obliged to make a video recording of the interrogation.

## C

### The Decision of the Trial Justice on the Motion to Suppress

At the close of the suppression hearing, the trial justice issued a bench decision denying defendant's motion to suppress. The trial justice initially noted that the state was required to prove by clear and convincing evidence that defendant's statements made during the interrogation were voluntary—which she stated meant that it was "the product of his free and rational choice" and not "extracted * * * by coercion or improper inducement including threats of violence or any undue influence that overcomes the free will of the Defendant." She added that the court would look to the totality of the circumstances. She then concluded that defendant was intelligent, educated, articulate, and a "mature adult."

In addressing the pantomime that the detectives performed, the trial justice expressed her view that Det. Rotella's "explanation that he was really doing a re-creation of what it would look like in court because defendants are always brought up chained to another defendant isn't particularly credible." She accepted "Defendant's version that the officer probably wanted to intimidate [him]," and she added that "of course the State has to prove by clear and convincing

- 6 -

evidence that he didn't make that demonstration for that purpose." She stated that, ultimately, she wasn't "sure."

Turning next to the issue of the use of vulgarity, the trial justice found that "[i]t was not used to make the Defendant comfortable;" but rather "[i]t was used to intimidate him." She stated that, on the audio recording, the officers were "bullying the Defendant by yelling at him over each other," and she found that it was "difficult to listen to * * *." She further addressed Det. Rotella's testimony about the "facial expressions of the Defendant as giving him reason to make determinations as to credibility," and she flatly stated that "the Court rejects that." She added that "[i]t was just too easy for a detective who didn't make use of video equipment to justify his conduct by saying, Well, you know, I had the opportunity to observe the manner in which he spoke, his facial expressions."[3]

The trial justice further ruled that there was no "unambiguous clear indication by this Defendant that he wished to stop the interview, that he wished to now assert his right to remain silent."

The trial justice added that she was "totally unimpressed by the police tactics in this case," although she acknowledged that the police "are permitted to use vulgarity," "deception," to "keep probing and probing," and also to make the defendant "uncomfortable." She then specifically addressed the point relative to one of the detectives having told defendant during the interrogation that, if defendant thought the victim was sixteen, "'that's it. That's the bottom line. The State of Rhode Island says yes.'" With respect to same, she stated: "Bluffing or lying about evidence,

---

[3] We deem it important to note that it is far and away the better practice to videotape the entirety of all custodial interrogations which, like the one at issue in this case, take place in the police station where video equipment should be readily available. We would strongly urge police officers in this state to hearken to our advice in that regard.

implied threats of punishment, implied promises of leniency are not sufficient to conclude that the confession was the product of overcoming the free will of an intelligent adult."

Lastly, the trial justice noted that the interrogation "wasn't a six-hour interrogation" and that defendant had not been deprived of sleep, food, or drink beforehand. She added that defendant "appear[ed] calm" and that he "appeared to understand the questions, to hold his own, [and] to challenge [the detectives'] positions."

Although she found the motion to suppress to be "troubling" and "not an easy one," the trial justice concluded that, under the totality of the circumstances, the state had proven "by clear and convincing evidence that the confession was knowing, intelligent and voluntary, not the product of coercion and threats." She accordingly denied defendant's motion to suppress his statements to the police during his interrogation.

A trial then took place over several days in May of 2017. For the purposes of this opinion, we need not relate the testimony at that trial. The jury ultimately found defendant guilty of the one count against him, and his motion for a new trial was thereafter denied. He was subsequently sentenced to thirty-five years, with twenty-three years to serve and twelve years suspended with probation. He was also required to register as a sex offender.

A judgment of conviction entered on July 6, 2017, and defendant filed a timely notice of appeal.

## II

### Standard of Review

In reviewing a trial justice's ruling with respect to a motion to suppress a "statement which a defendant has alleged was made involuntarily," we employ "a two-step analysis." *State v. Barros*, 24 A.3d 1158, 1179 (R.I. 2011) (internal quotation marks omitted); *see also State v.*

*Bojang*, 138 A.3d 171, 178 (R.I. 2016); *State v. Taoussi*, 973 A.2d 1142, 1146 (R.I. 2009). In the first step, this Court reviews the factual findings of the trial justice "relative to the issue of the voluntariness of the confession." *Barros*, 24 A.3d at 1179; *see also State v. Perez*, 882 A.2d 574, 588 (R.I. 2005). In so doing, we "accord deference to the trial justice's findings of historical fact unless those findings are clearly erroneous." *Barros*, 24 A.3d at 1179; *see also Taoussi*, 973 A.2d at 1146. A finding of fact is considered to be clearly erroneous only "when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Barros*, 24 A.3d at 1179 (internal quotation marks omitted); *see also Perez*, 882 A.2d at 588.

We will proceed with the second step of the analysis "[i]f we conclude that the trial justice's findings of historical fact were not clearly erroneous * * *." *Barros*, 24 A.3d at 1179. The second step in the analysis requires this Court to "apply [the] historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement." *Id.* (internal quotation marks omitted); *see State v. Bido*, 941 A.2d 822, 836 (R.I. 2008); *see also State v. Dennis*, 893 A.2d 250, 261 (R.I. 2006) ("[T]he ultimate question of whether a confession was given voluntarily is legal in nature, and this Court undertakes a *de novo* review of questions of law and mixed questions of law and fact insofar as those issues involve constitutional issues.").

## III

## Analysis

## A

## The Defendant's Statements During the Interrogation

Mr. Munir contends on appeal that the trial justice clearly erred under the totality of the circumstances in determining that the state had proven by clear and convincing evidence that the

statements he made during the interrogation were knowing, intelligent, and voluntary. The defendant avers that the "coercive tone of the entire interrogation" was "designed to inspire fear * * *." He points specifically to the fact that vulgar language and raised voices were used during the interrogation and to the fact that he was subject to a "barrage" of questions. He also points to the pantomime performed by the detectives wherein he was portrayed as being handcuffed together with another prisoner and led before a judge, which he claims was done in order to intimidate him.

"When ruling on a motion to suppress a confession, the trial justice should admit a confession or a statement against a defendant only if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona*[, 384 U.S. 436 (1966)]." *State v. Musterd*, 56 A.3d 931, 937-38 (R.I. 2012) (internal quotation marks omitted); *see also State v. Jimenez*, 33 A.3d 724, 733-34 (R.I. 2011).

While the crux of Mr. Munir's argument on appeal seems to focus on the voluntariness of the waiver of his *Miranda* rights, we will begin by briefly addressing the knowing and intelligent waiver of those rights.[4] A statement is made knowingly and intelligently if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Musterd*, 56 A.3d at 938 (internal quotation marks omitted); *see also Jimenez*, 33 A.3d at 734. We have further stated that "[a] knowing and intelligent waiver may be executed when a defendant is apprised of the *Miranda* warnings, comprehends such warnings, and thereafter

---

[4]     As we deal with the knowing and intelligent prongs of the waiver of *Miranda* rights issue, we note that we accord deference to the factual findings of the trial justice through our reliance on the clearly erroneous standard of review, whereas we review *de novo* questions of law or mixed questions of fact and law involving constitutional issues. *State v. Jimenez*, 33 A.3d 724, 732 (R.I. 2011).

makes a voluntary statement." *Jimenez*, 33 A.3d at 735 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.")). Assessing whether or not a knowing and intelligent waiver took place requires "an analysis of the totality of the circumstances surrounding the interrogation." *Id.* at 734 (internal quotation marks omitted).

In this instant case, the trial justice found Mr. Munir to be an intelligent, educated man; she further found him to be articulate and to be a "mature adult." She found that he had been advised of his rights and that he had agreed to speak with the detectives, thus waiving his rights. Our review of the record discloses nothing that would support a conclusion that those factual findings were clearly erroneous. *See Barros*, 24 A.3d at 1179.

We turn then to the trial justice's legal conclusion that Mr. Munir's statements during his interrogation were knowing and intelligent. *See id.* Detective Rotella testified that he read Mr. Munir's rights to him before bringing him to the interrogation room, and the transcript and audio recording reflect the fact that he informed Mr. Munir of his rights a second time in the interrogation room. Mr. Munir answered in the affirmative when asked if he understood his rights. He confirmed to the detectives that he was able to read and write in English. He actually read some of his rights back to the detectives, including the right to remain silent. Mr. Munir then confirmed to the detectives that he had signed the "rights form." When Det. Rotella asked Mr. Munir if he wanted to talk to the detectives, Mr. Munir agreed.[5] It is thus clear to this Court, as it was to the trial justice, that, upon taking into account the totality of the circumstances of defendant's

---

[5] We note that, during the interrogation, Mr. Munir never invoked his right to counsel or his right to remain silent (although he contends otherwise, *see* Part III.B, *infra*).

interrogation, he was properly advised of his rights, and he understood those rights as well as the consequences of waiving them. *See Musterd*, 56 A.3d at 938. As such, in our judgment, the state demonstrated by clear and convincing evidence that Mr. Munir's statements during his interrogation were knowing and intelligent. *See id.*

Establishing that the trial justice did not err in determining that Mr. Munir's waiver of his *Miranda* rights was knowing and intelligent does not end the inquiry. We must now consider whether or not Mr. Munir's statements to the police were voluntary. We have stated that "[a] statement is voluntary when it is the product of [the defendant's] free and rational choice." *Musterd*, 56 A.3d at 938 (internal quotation marks omitted); *see also Jimenez*, 33 A.3d at 734. In contrast, a statement is involuntary when it is "extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant * * *." *Musterd*, 56 A.3d at 938 (internal quotation marks omitted); *see also Barros*, 24 A.3d at 1180. When reviewing the voluntariness of a confession, we consider "the totality of the circumstances surrounding the challenged statement." *Musterd*, 56 A.3d at 938 (internal quotation marks omitted); *see also State v. Gouin*, 182 A.3d 28, 34 (R.I. 2018). We have further stated that, "[a]bsent evidence that [defendant's] will was overborne and his capacity for self-determination critically impaired because of coercive police conduct[,] * * * his waiver * * * was voluntary under * * * *Miranda*." *Jimenez*, 33 A.3d at 734 (internal quotation marks omitted).

We look first to the factual findings of the trial justice. *See Barros*, 24 A.3d at 1179. With respect to the issue of voluntariness, the trial justice found that she was not "sure" if the pantomime performed during the course of the interrogation was intended to intimidate defendant. She added that the use of vulgarity was intended to intimidate defendant and make him uncomfortable. She

noted the yelling and bullying by the detectives; but she also acknowledged that police are permitted to use vulgarity and to use deception with respect to the state of the evidence. She also found that the interrogation was not overly long and that defendant had not been deprived of sleep, or food, or drink before the interrogation. She added that Mr. Munir appeared to be calm and to "understand the questions, to hold his own, [and] to challenge [the detectives'] positions." Upon listening to the audio recording of the interrogation, reading the transcript of the interrogation, and considering the transcript of the suppression hearing, we do not perceive any basis for holding that any of the trial justice's findings of fact were clearly erroneous. *See id.*

Moving to the second step in our analysis, we acknowledge that the trial justice was "troubl[ed]" and "unimpressed" by the conduct of the police in this case, and we are certainly not favorably impressed by the tone of the interrogation or some of the tactics employed by the detectives. *See id.* Nevertheless, we too reach the same conclusion as the trial justice—*i.e.*, that Mr. Munir's statements were voluntary. There are numerous indications throughout the interrogation of the fact that Mr. Munir was voluntarily speaking with the police. Mr. Munir stated, at one point during the interrogation: "I'm openly talking to you guys * * *." He was asked thereafter whether he chose to talk to the detectives, and he said: "I chose to talk to you as a statement. Now, it's getting turned around on me, because I --[.]" Not long after that remark, he added that he was "being open with" the detectives and that he was "talking to" them; he stated that that fact should "mean something." Mr. Munir also expressly indicated to the detectives during the interrogation that he was "sitting here talking." Thus, we consider Mr. Munir's own statements to be strong indicators of the voluntariness of the statements which he made during the interrogation, but we will nonetheless proceed to address some of the other facts pointed to by Mr. Munir on appeal.

Mr. Munir mentions that he was handcuffed to the wall during the interrogation. However, we have held that "handcuffing defendant's hand to the wall * * * does not negate the voluntariness of a confession." *Barros*, 24 A.3d at 1181; *see also State v. Hall*, 940 A.2d 645, 657 (R.I. 2008); *State v. Humphrey*, 715 A.2d 1265, 1275 (R.I. 1998). We further note that Det. Rotella implied to Mr. Munir that the police were in possession of a DNA sample from the complaining witness's body and that they would have it tested to see if it matched Mr. Munir's DNA, despite the fact that no DNA evidence had been collected. But we have held that "law enforcement officers may inform a suspect, truthfully or otherwise, of the evidence against him." *State v. Marini*, 638 A.2d 507, 513 (R.I. 1994). What is more, as the detectives did in this case, "[l]aw enforcement agents are also permitted to tell an accused that his cooperation would be 'helpful' to him * * * and that a confession would 'make it better' * * *." *Id.* (internal quotation marks omitted). Additionally, while the trial justice was unsure with respect to the intent behind the pantomime at issue, it is our view that, even recognizing that the issue of intent is fog-shrouded and unresolved, the pantomime did not constitute coercive conduct.[6]

We certainly acknowledge that the interrogation by the detectives contained a significant level of vulgarity, raised voices, and a barrage of questions. It is also evident that it was stated to Mr. Munir during the interrogation that, if he had been under the impression that the victim was sixteen, that would not be "frowned upon" and that the state would say "yes."[7] But we are simply

---

[6]    It should go without saying that the trial justice, the jury, and this Court would have been better able to evaluate the pantomime issue if the interrogation had been videotaped.

[7]    We pause to note that the extent to which the police can lie with respect to the law in a custodial interrogation is certainly not limitless. *See, e.g.*, *People v. Thomas*, 8 N.E.3d 308, 313-14 (N.Y. 2014) ("It is well established that not all deception of a suspect is coercive, but in extreme forms it may be. Whether deception or other psychologically directed stratagems actually eclipse individual will, will of course depend upon the facts of each case, both as they bear upon the means employed and the vulnerability of the declarant."); *see also Miller v. Fenton*, 796 F.2d 598, 607

- 14 -

not convinced that those facts, even coupled with the other circumstances that we have described, were sufficient to constitute the overbearing of Mr. Munir's will. *See Jimenez*, 33 A.3d at 734. He is an intelligent adult, whom the trial justice characterized as remaining rather calm through the course of the interrogation and as clearly understanding the questions he was being asked. In addition, Mr. Munir did not invoke his right to counsel. He was not subject to any threats or violence. Thus, we are unable to conclude, based on the totality of the circumstances in this case, that Mr. Munir's statements to the police were coerced or not the product of his own free will. Having carefully reviewed the record, we are able to say with confidence that the state met its burden of showing by clear and convincing evidence that the statements to the police at issue in the case were voluntary.

Accordingly, we can perceive no error in the conclusion of the trial justice that Mr. Munir's statements to the police were knowing, intelligent, and voluntary.

**B**

**Invocation of the Right to Remain Silent**

The defendant contends on appeal that he invoked his right to remain silent during his interrogation. He points specifically to the following exchange:

> "DETECTIVE ROTELLA: Do you have anything else you want to
> say? Did you do it?
> "HASIM MUNIR: I don't -- I have nothing else to say."

Thus, for the purposes of this issue on appeal, we are concerned with whether or not Mr. Munir invoked his right to remain silent when he stated that he had "nothing else to say." If a suspect validly invokes his or her right to remain silent, the interrogation should cease and his or

---

(3d Cir. 1986) ("While a lie told to the detainee about an important aspect of the case may affect the voluntariness of the confession, the effect of the lie must be analyzed in the context of all the circumstances of the interrogation.").

her right to cut off questioning should be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (internal quotation marks omitted); *see Maryland v. Shatzer*, 559 U.S. 98, 103-04 (2010); *Miranda*, 384 U.S. at 473-74; *State v. Iovino*, 524 A.2d 556, 561 (R.I. 1987); *see also* G.L. 1956 § 9-19-25.  In the context of this case, if Mr. Munir in fact invoked his right to remain silent, as he contends he did when he stated that he had "nothing else to say," anything that he said after that invocation would not have been admissible against him.

With respect to this issue, the trial justice found that there was no "unambiguous clear indication by this Defendant that he wished to stop the interview, that he wished to now assert his right to remain silent."  In such a situation, the trial justice's determination is a mixed question of fact and law with respect to a constitutional question and thus requires us to conduct our review in a *de novo* manner.  *State v. Dumas*, 750 A.2d 420, 424, 425 (R.I. 2000) (stating that the question of whether a suspect's words could be "reasonably understood as a request for counsel is a mixed question of law and fact").  Upon thorough consideration of the record before us, we are of the opinion that the trial justice did not err in determining that Mr. Munir did not invoke his right to remain silent in the instant case.  Indeed, we would have reached the same conclusion.

In *Davis v. United States*, 512 U.S. 452 (1994), the United States Supreme Court held that a suspect must "unambiguously" invoke his or her right to counsel under *Miranda*.  *Davis*, 512 U.S. at 459.  The Supreme Court held in that case that the police need not cease an interrogation if the invocation of the right to counsel is "ambiguous or equivocal * * *." *Id.*  The Supreme Court subsequently stated in *Berghuis* that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Berghuis*, 560 U.S. at 381; *see also State v. Sabetta*, 680 A.2d 927, 932 (R.I. 1996) (stating that an ambiguous and equivocal statement invoking the right to

counsel did not require the cessation of questioning and applying that same standard to the invocation of the right to remain silent). The Supreme Court in *Berghuis* further pointed out that, "[i]f an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong." *Id.* at 382 (internal quotation marks omitted). The Court went on to hold that the defendant in that case had not unambiguously invoked his right to remain silent just by saying nothing for a sufficient period of time during the interrogation; the Court noted that the defendant did not say that he wanted to remain silent or that he did not want to talk with the police. *Id.*

It is clear to this Court that Mr. Munir likewise did not unambiguously and unequivocally invoke his right to remain silent. The statement "I have nothing else to say," when considered in the context of the question-and-answer nature of the interrogation at issue—*i.e.*, in response to a question asking if he had anything else to say—does not, in this Court's considered opinion, rise to the level of an unambiguous invocation of the right to remain silent.

We have previously held that a statement by a suspect to the effect that he "needed time to think plus his silence in the face of any questions" did not constitute an invocation of the suspect's right to remain silent. *State v. Peabody*, 611 A.2d 826, 836 (R.I. 1992) (internal quotation marks omitted). We have also held that the statement "I don't want to talk about it right now" expressed an intention to remain silent only "in regard to the moment" and thus was not an unequivocal invocation of the right to remain silent. *Sabetta*, 680 A.2d at 932. What is more, we have held that a suspect stating that he had nothing to say at that time was also not tantamount to invoking his right to remain silent. *State v. Pacheco*, 481 A.2d 1009, 1015-16 (R.I. 1984). In our opinion, Mr. Munir's statement to the effect that he had "nothing else to say," in view of the context in

- 17 -

which he uttered it, is in line with the statements in the just-referenced cases. It did not amount to an unambiguous and unequivocal invocation of his right to remain silent.

Accordingly, we affirm the trial justice's denial of Mr. Munir's motion to suppress his statements to the police during his interrogation.

## IV

## Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. We remand the record to that tribunal.

**Justice Flaherty, with whom Justice Robinson joins, concurring.** I endorse the majority's eloquent and well-reasoned opinion in this case and the outcome the Court reaches. I nonetheless am constrained to write separately to reiterate my ongoing and persistent misgivings as to the practice of interrogating suspects in police custody without the benefit of a videotape of the interrogation. Confessions are the ultimate inculpatory evidence in a criminal trial, and an admission of guilt from the defendant's own tongue cannot help but have an enormous impact on a factfinder. Indeed, it is for this very reason that the police work so hard, as they should, to obtain them.

However, without a video recording of the interrogation, any discussion of the interrogation at trial inevitably devolves into a "swearing contest." *State v. Kekona*, 886 P.2d 740, 746 (Haw. 1994). As I have mentioned in prior dissents and concurrences to previous opinions of this Court: "Invariably, jurors are tasked with determining whose story to believe: the police, who categorically say that the accused was calm, comfortable, and subjected to no inappropriate

- 18 -

physical or emotional pressure, or the defendant, who often complains of emotional browbeating and physical deprivation." *State v. Barros*, 24 A.3d 1158, 1185 (R.I. 2011) (Flaherty, J., dissenting in part and concurring in the result); *see State v. Bojang*, 138 A.3d 171, 181 (R.I. 2016) (Flaherty, J., and Robinson, J., concurring); *State v. Bojang*, 83 A.3d 526, 545 n.7 (R.I. 2014) (Flaherty, J., dissenting in part and concurring in part).

Indeed, such is the case here, where defendant claims that he unequivocally invoked his Fifth Amendment right to silence, but the detective who conducted the interrogation testified that he continued the interrogation "because of [defendant's] reaction to my questions or his facial expressions[.]" Unfortunately, and, in my opinion, unacceptably, the trial justice and the members of the jury were deprived of the opportunity to evaluate defendant's facial expressions and body language for themselves because they did not have the benefit of a video recording. Although an audio recording of Mr. Munir's statement was made and offered into evidence, Detective Rotella testified that he did not videotape the interrogation because the "video recording system was down" in that particular interrogation room on the day in question, and, in any event, there was no policy requiring him to record a video of the interrogation.[8]

I cannot accept this feeble excuse. In this age of smartphones and tablets, police officers need reach no further than their own pockets to find a device capable of video recording an interrogation. In fact, Detective Rotella testified that he used his own device to make the audio recording that is in evidence. Adding video to that recording would have been no more difficult than propping up a smartphone in a corner of the room. I find it bewildering that depositions in

---

[8]     The record is not altogether clear on the operability of the video system on the relevant date, but there certainly was no impediment to bringing defendant to the police station of a neighboring community so that his statement could be recorded. In any event, it is clear that the detectives had no intention of videotaping defendant's statement because there was no requirement that they do so.

civil cases are recorded with increasing frequency, but an interrogation with a defendant's liberty on the line need not be. As I have said before, "[i]n this day and age, a person cannot avoid being videotaped when he enters an office building or retail establishment, or even when he cashes a check. That being the case, it is perplexing to me that he can confess to a capital crime without the benefit of having his statement recorded, even when the necessary equipment is readily available." *Bojang*, 83 A.3d at 545 n.7 (Flaherty, J., dissenting in part and concurring in part).

As of this writing, twenty-five states and the District of Columbia now require or encourage, in one form or another, custodial interrogations to be recorded. *See* Ark. R. Crim. P. 4.7 (Arkansas); Cal. Penal Code § 859.5 (2017) (California); Colo. Rev. Stat. § 16-3-601 (2016) (Colorado); Conn. Gen. Stat. § 54-1*o*(b) (2014) (Connecticut); D.C. Code §§ 5-116.01–116.03 (2005) (District of Columbia); 705 Ill. Comp. Stat. 405/5-401.5 and 725 Ill. Comp. Stat. 5/103-2.1 (2017) (Illinois); Ind. R. Evid. 617 (Indiana); Kan. Stat. Ann. § 22-4620 (2017) (Kansas); Me. Stat. tit. 25, § 2803-B (2015) (Maine); Md. Code Ann., Crim. Proc. §§ 2-402 and 2-403 (2008) (Maryland); Mich. Comp. Laws §§ 763.7–11 (2013) (Michigan); Mo. Rev. Stat. § 590.700 (2017) (Missouri); Mont. Code Ann. §§ 46-4-406–411 (2009) (Montana); Neb. Rev. Stat. §§ 29-4501–4508 (2008) (Nebraska); N.J. Court Rules 3:17 (New Jersey); N.M. Stat. Ann. § 29-1-16 (2006) (New Mexico); N.Y. Crim. Proc. Law § 60.45 (2018) (New York); N.C. Gen. Stat. Ann. § 15A-211 (2011) (North Carolina); Or. Rev. Stat. Ann. § 133.400 (2018) (Oregon); Tex. Crim. Proc. Code Ann. art. 2.32 and art. 38.22, § 3 (2017) (Texas); Utah R. Evid. 616 (Utah); Vt. Stat. Ann. tit. 13, § 5585 (2015) (Vermont); Wis. Stat. Ann. § 968.073 (2019) (Wisconsin); *Stephan v. State*, 711 P.2d 1156, 1159 (Alaska 1985); *Commonwealth v. DiGiambattista*, 813 N.E.2d 516, 533-34 (Mass. 2004); *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994).

I take this opportunity to restate my unyielding belief that this state should join the majority of our sister states that either require custodial interrogations to be recorded or that inform factfinders of the failure to do so. With the stakes as high as they are, there remains no cogent reason for such a shortcoming. At the very least, a criminal defendant is, at his or her request, entitled to an instruction informing the jury that it may consider law enforcement's failure to make a video recording of an interrogation when it assesses the voluntariness of a defendant's statement.

Nevertheless, in the context of this case, in which no such instruction was sought, the jury had the benefit of at least an audio recording, and that recording satisfies me that defendant's statement was voluntary. I therefore concur with the majority insofar as the Court affirms the judgment of conviction.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Hasim Munir. |
| **Case Number** | No. 2018-43-C.A.<br>(P1/16-2489A) |
| **Date Opinion Filed** | June 11, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General |
| | For Defendant:<br><br>Susan B. Iannitelli, Esq. |