June 30, 2020

**Supreme Court**

No. 2018-191-C.A.
(P1/15-3394A)

State                   :

v.                     :

Edilsar Alvarado.          :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State of Rhode Island          :

v.                             :

Edilsar Alvarado.             :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  The defendant, Edilsar Alvarado, appeals from a judgment of conviction on two counts of first-degree child molestation sexual assault.  The defendant asserts that the trial justice erred (1) in denying his motion to suppress statements made to the police; (2) in denying his motion for a mistrial, based on a claimed Rule 16 discovery violation; and (3) in denying his Rule 29(b) motion to dismiss as to counts one and two of the indictment.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

In 2008, the complainant, Meghan,[1] was thirteen years of age and resided with the defendant, Alvarado.  Meghan first met Alvarado in her country of origin, Guatemala.  At that time, Meghan lived with her mother, Maria Ortega.  During a visit to Guatemala, Alvarado, who

---

[1] To protect the anonymity of the complaining witness, we have used a pseudonym in place of her name.

was twenty-nine years old at that time, offered to bring Meghan to the United States to live with him. Meghan testified that Alvarado told her that she could attend school and have a better life in the United States. Meghan further said that she wanted to come to the United States to work and send money back home. Additionally, two of her brothers already lived in the United States, and Meghan knew that one of her sisters was planning to come to the United States.

In April 2008, Meghan and her sister began their journey to the United States. For that purpose, Alvarado paid a "coyote" to transport Meghan from Guatemala to Rhode Island.[2] In the trial justice's words, Meghan's journey was "the stuff movies are made of." Meghan and her sister joined a group that traveled from Guatemala to Mexico. Once in Mexico, the group attempted to cross the border into the United States. That attempt turned out to be unsuccessful, because the group was intercepted by members of the United States Customs and Border Protection. Meghan, who had become separated from her sister, then hid for two days before she was eventually apprehended by border agents. As she had been instructed, Meghan lied about her age to avoid prolonged detention. She was returned to Mexico.

After her return to Mexico, Meghan was able to reconnect with the coyote. From there, Meghan successfully crossed into the United States. Meghan was then transported to Los Angeles, where she joined another group. From Los Angeles, the group traveled across the United States, stopping to drop off members of the group in various locations. However, before reaching Rhode Island, and citing certain group members' inability to pay, the coyote stopped the journey.[3] After she was abandoned by the coyote, Meghan telephoned Alvarado, who drove to her location and brought her to Rhode Island.

---

[2] From our review of the record, a "coyote" is essentially a human smuggler.
[3] Although Meghan did not identify the state in which she was abandoned, Alvarado told police that he picked up Meghan in New York.

Meghan testified that, on two separate occasions during her first two days in Rhode Island, Alvarado sexually assaulted her.[4]  Meghan testified that at that time she was thirteen years old.

Meghan said that a few months later, Alvarado registered her for school and that he told school officials that he was Meghan's cousin.  According to Meghan, Alvarado, who was then thirty-one years old, instructed her that she was not to tell anyone about their relationship or what was going on at home.  Meghan further testified that Alvarado would sexually assault her regularly, about three to four times per week.  She said that she never consented and that she never wanted to have sex with Alvarado.  Meghan also testified about two other specific assaults that she alleged had occurred when she was fourteen years old.

After living with Alvarado for some time, Meghan became pregnant.  In 2010, when she was but fifteen, Meghan gave birth to a daughter.  It is undisputed that Alvarado is the father of Meghan's child; however, she said that Alvarado instructed her to not designate him as the father on the birth certificate.  She also said that Alvarado told hospital personnel that he was Meghan's cousin.

Meghan had left Alvarado by 2014; at that time, she was nineteen years old.  An acrimonious custody dispute over their child soon began in Family Court.  At that point, Meghan informed both her attorney and the authorities[5] about the sexual assaults she alleged that she had suffered at the hands of Alvarado.[6]  Indeed, at a hearing in Family Court, Alvarado acknowledged

---

[4] For purpose of this opinion, a precise recitation of the sordid details of the acts allegedly committed by Alvarado is unnecessary.  However, it is clear from Meghan's testimony that Alvarado's actions on the first two days met the elements of first-degree child molestation sexual assault as set forth in G.L. 1956 § 11-37-8.1.

[5] Meghan and her attorney contacted both the Rhode Island State Police and the Providence Police Department.

[6] Additionally, at that time Meghan applied for immigration status as a result of her claims that she was a victim of human trafficking and exploitation.

in his testimony that he had a sexual relationship with Meghan from the outset of their relationship. This triggered a criminal investigation into Alvarado's actions.

On October 21, 2015, a grand jury indicted Alvarado on five counts. Counts one and two charged Alvarado with first-degree child molestation sexual assault in violation of G.L. 1956 § 11-37-8.1[7] and § 11-37-8.2 for the assaults that were alleged to have occurred in April 2008. Counts three and four charged Alvarado with first-degree sexual assault in violation of § 11-37-2 and § 11-37-3. An amended indictment was later filed that indicated that counts three and four related to events that were alleged to have occurred after Meghan turned fourteen years old.[8]

After Alvarado was arrested, he was interviewed by Detectives Mark Alboum and Heather Donahue, of the Rhode Island State Police.[9] During that interview, Alvarado denied that his relationship with Meghan was not consensual. However, throughout the interview, Alvarado claimed that Meghan was various ages at the time their sexual relationship began. When pressed by detectives, Alvarado said that Meghan had told him she was fifteen. Although Alvarado merely clarified what Meghan's age might have been at the time the sexual relationship began, he did not deny the fact that he had engaged in sexual relations with Meghan.

---

[7] General Laws 1956 § 11-37-8.1 provides: "A person is guilty of first-degree child molestation sexual assault if he or she engages in sexual penetration with a person fourteen (14) years of age or under."

[8] Alvarado was also charged with simple assault in violation of G.L. 1956 § 11-5-3. However, that charge was dismissed at trial because the statute of limitations had expired.

[9] That interrogation was both audio and video recorded. The state police created a transcript from the audio recording. Because neither party has disputed the authenticity of that transcript, and because our own review of the transcript shows that it is consistent with the recordings, we rely on both the recordings and the transcript.

Before trial, Alvarado moved to suppress the statements that he made to Det. Alboum and Det. Donahue.[10] The trial justice denied Alvarado's motion, after which a jury-waived trial commenced.

At trial, Meghan's mother, Maria Ortega, testified that, while he was in Guatemala, Alvarado had asked her for Meghan's hand. When asked to clarify that statement by the prosecutor, Ortega explained that she meant that Alvarado "took [Meghan] as his wife[.]" After some further testimony, Alvarado objected and moved for a mistrial, arguing that the state had violated Rule 16 of the Superior Court Rules of Criminal Procedure. He argued that the state had failed to provide him with any notice that Ortega would testify that Alvarado had asked for her permission to marry Meghan. The trial justice continued the trial in order for the state to obtain a better translation of the state's previous interview with Ortega. After reviewing Alvarado's arguments and the record, the trial justice denied Alvarado's motion for a mistrial. Instead, the trial justice treated the five-day continuance as the remedy for any discovery violation on the part of the state.[11]

At the close of the state's case, Alvarado moved to dismiss all counts of the indictment pursuant to Rule 29(b) of the Superior Court Rules of Criminal Procedure.[12] The trial justice granted defendant's motion as to counts three and four. In doing so, the trial justice found that Meghan's testimony regarding force or coercion was insufficient and not credible, as the

---

[10] We will discuss the facts surrounding the suppression hearing *infra*.

[11] Alvarado objected and moved for a mistrial on May 31, 2017. The trial justice continued the case for the state to obtain a better translation and the trial resumed on June 2. After denying Alvarado's motion, the trial justice continued the case again, and the trial resumed on June 5. From our review of the record, the trial justice treated the five days between Alvarado's objection and when the trial reconvened as the remedy for any prejudice.

[12] Rule 29(b) of the Superior Court Rules of Criminal Procedure states: "In a case tried without a jury, a motion to dismiss may be filed at the close of the State's case to challenge the legal sufficiency of the State's trial evidence."

allegations coincided with the custody battle in Family Court. The trial justice determined that the state "failed to offer sufficient evidence of force or coercion[.]"

With respect to counts one and two for first-degree child molestation sexual assault, however, the trial justice found Meghan's testimony credible about the two sexual assaults that had occurred when Meghan was thirteen years of age. Alvarado then presented two witnesses and rested.

At the close of trial, the trial justice found defendant guilty on both counts of first-degree child molestation sexual assault. The trial justice sentenced defendant to two concurrent terms of eighteen years at the Adult Correctional Institutions, with nine years to serve and nine years suspended, with probation. The defendant timely appealed.

## II

### Discussion

On appeal, Alvarado argues that the trial justice erred (1) in denying his motion to suppress statements made to the state police; (2) in denying his motion for a mistrial, based on his allegations of a Rule 16 discovery violation; and (3) in denying his Rule 29(b) motion to dismiss as to counts one and two of the indictment. We address each argument in turn.

### A

### Motion to Suppress

With respect to his first argument, Alvarado submits that the trial justice erred when she found that he knowingly, intelligently, and voluntarily waived his *Miranda* rights when he was questioned by state police detectives.[13] More specifically, Alvarado contends that there are several factors that clearly establish that he did not knowingly, intelligently, and voluntarily waive his

---

[13] *Miranda v. Arizona*, 384 U.S. 436 (1966).

rights. Those include: (1) his limited ability to understand English; (2) the fact that he did not state orally that he understood his rights; (3) his lack of a formal education past grade six; (4) his lack of experience with the criminal justice system; and finally, (5) the fact that the police informed him that he was being interrogated concerning a sexual assault and not child molestation.

### 1

### Standard of Review

"In reviewing a trial justice's ruling with respect to a motion to suppress a 'statement which a defendant has alleged was made involuntarily,' we employ 'a two-step analysis.'" *State v. Munir*, 209 A.3d 545, 550 (R.I. 2019) (quoting *State v. Barros*, 24 A.3d 1158, 1179 (R.I. 2011)). "In the first step, this Court reviews the factual findings of the trial justice 'relative to the issue of the voluntariness of the confession.'" *Id.* (quoting *Barros*, 24 A.3d at 1179). "In so doing, we 'accord deference to the trial justice's findings of historical fact unless those findings are clearly erroneous.'" *Id.* (quoting *Barros*, 24 A.3d at 1179). "The second step in the analysis requires this Court to 'apply the historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement.'" *Id.* at 551 (brackets omitted) (quoting *Barros*, 24 A.3d at 1179).

### 2

### Analysis

"When ruling on a motion to suppress a confession, the trial justice should admit a confession or a statement against a defendant only if the state can first prove[,] by clear and convincing evidence[,] that the defendant knowingly, intelligently, and voluntarily waived [the] constitutional rights expressed in *Miranda v. Arizona*, 384 U.S. 436 (1966)." *Munir*, 209 A.3d at 551 (quoting *State v. Musterd*, 56 A.3d 931, 937-38 (R.I. 2012)). "A statement is made knowingly and intelligently if it is made 'with a full awareness of both the nature of the right being abandoned

and the consequences of the decision to abandon it.'" *Id.* (quoting *Musterd*, 56 A.3d at 938). "We have further stated that 'a knowing and intelligent waiver may be executed when a defendant is apprised of the *Miranda* warnings, comprehends such warnings, and thereafter makes a voluntary statement.'" *Id.* (brackets omitted) (quoting *State v. Jimenez*, 33 A.3d 724, 735 (R.I. 2011)).

"Assessing whether or not a knowing and intelligent wavier took place requires 'an analysis of the totality of the circumstances surrounding the interrogation.'" *Munir*, 209 A.3d at 552 (quoting *Jimenez*, 33 A.3d at 734). As part of this analysis, courts consider the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Jimenez*, 33 A.3d at 735-36 (brackets omitted) (quoting *State v. Garcia*, 643 A.2d 180, 189 (R.I. 1994)). However, a "defendant's lack of previous experience with the criminal justice system is relevant only so far as its 'impact on the defendant's ability to comprehend the *Miranda* warnings.'" *Id.* at 736 (brackets and emphasis omitted) (quoting *State v. Leuthavone*, 640 A.2d 515, 520 (R.I. 1994)).

In addition to considering a defendant's background and experience, courts also must consider any language barriers that a defendant may have. *Jimenez*, 33 A.3d at 736. As we have said, "language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights[.]" *Id.* (quoting *Leuthavone*, 640 A.2d at 520). However, "when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated." *Id.* (quoting *Leuthavone*, 640 A.2d at 520).

To begin our analysis, we briefly relay the facts surrounding the statement that Alvarado gave to the police. At the suppression hearing, Det. Alboum testified that he and Det. Donahue

interviewed Alvarado after he was arrested. That interview was memorialized in both audio and video recordings. The video recording was played for the trial justice.[14]

At the start of the interview, Det. Alboum asked Alvarado whether he understood English. Alvarado responded: "I understand a lot but not a hundred percent." Detective Alboum then asked Alvarado if he were to read the *Miranda* rights waiver form to him, would he understand it. Alvarado hesitated, but agreed that he would give it a try. In response to Alvarado's seeming hesitation, Det. Alboum and Det. Donahue decided that Det. Donahue would procure a Spanish version while Det. Alboum proceeded to go through the English version with Alvarado. As part of his explanation, Det. Alboum informed Alvarado that he was a suspect in the crime of sexual assault. Detective Alboum then asked Alvarado if he knew why he was being questioned. In his response, Alvarado said that he had been to court several times. Detective Alboum then continued to explain the remainder of the English rights form. However, Alvarado did not sign the form. Instead, Det. Alboum and Alvarado waited until Det. Donahue returned with the Spanish version of the *Miranda* rights form.

Upon Det. Donahue's return, Det. Alboum asked if Alvarado was able to read Spanish; Alvarado responded that he could. Detective Alboum then asked Alvarado to read the form, initial each numbered paragraph listing his *Miranda* rights, and then sign the form. Alvarado quietly read the form, following along with a pen. Alvarado at one point questioned the word "suspect" in the form. Detective Alboum responded by again informing Alvarado that he was being questioned as a suspect in the crime of sexual assault. Alvarado then continued to read the form quietly. After he finished reading the Spanish version of the form, Alvarado signed the form and

---

[14] We also have reviewed the video recording. We commend the detectives for memorializing the interview with defendant.

handed it back to Det. Alboum.  However, Alvarado did not initial the numbered paragraphs as instructed.  Detectives Alboum and Donahue then filled out their portion of the form, and each signed it.  While Det. Alboum filled out his portion of the form, Alvarado assisted Det. Alboum by translating the Spanish word for "place" into English.  Finally, Det. Alboum once again asked Alvarado if he understood English, and Alvarado responded that he did.

As the interview began, Det. Alboum once again asked Alvarado whether he knew why he was being questioned.  Alvarado stated that he did not know, mentioning again that he had been to court.  Detective Alboum then asked Alvarado if he had been advised of his rights and whether he understood them.  As part of this question, Det. Alboum employed the Spanish word "comprende" after using the English word "understand."  Alvarado answered in the affirmative that he did understand.  Detective Alboum then began asking Alvarado about Meghan.

During the course of the interview, Alvarado on occasion asked Det. Alboum to clarify a question, which the detective patiently took the time to do.  Sometimes Det. Alboum used Spanish words; however, it is unclear whether Alvarado's hesitation was the result of a language barrier or a reluctance to answer questions concerning Meghan's age.  Near the end of the interview, Det. Donahue reminded Alvarado that the purpose of the interview was not to discuss the custody issue.  Detective Donahue then explained to Alvarado that he was being questioned about a criminal matter, and Alvarado responded that he understood.  However, that discussion was part of a larger discussion in which both detectives explained to Alvarado that having sex with a thirteen-year-old girl was a crime.

During cross-examination, Det. Alboum conceded that he was aware that Alvarado had made use of a Spanish language interpreter during the child custody dispute in Family Court.  Detective Alboum further testified that the state police have procedures to provide for a Spanish

- 10 -

language interpreter during interrogations, but that he did not avail himself of an interpreter in this case.

After Det. Alboum's testimony concluded, Alvarado argued that he had not made a knowing, voluntary, and intelligent waiver of his *Miranda* rights and that it was clear, from both the testimony and the video recording, that the state did not meet its burden of showing that Alvarado understood why he was being questioned. Further, Alvarado argued that the police should have procured a Spanish language interpreter to explain his *Miranda* rights, specifically his right to remain silent, and to inform him of the reason for which he was being questioned: first-degree child molestation sexual assault and first-degree sexual assault charges. Alvarado also argued that his lack of education and lack of experience with the criminal justice system demonstrated that he did not understand his rights or the reason that he was being questioned.

The trial justice, after considering all the evidence and the arguments of the parties, denied Alvarado's motion to suppress. As part of her decision, the trial justice explained that Alvarado "spoke practically fluent English in giving [his] statement that lasted almost an hour." She also noted that Alvarado, when reading the Spanish rights form, used his pen as a guide to "read each word on each line in his native language, Spanish." She concluded that the state had proven by clear and convincing evidence that Alvarado had voluntarily, knowingly, and intelligently waived his rights, because not only did Alvarado understand English, but there was also no indication that he could not comprehend his rights when he read them in Spanish.

Fortunately, the police video recorded Alvarado's interview. That video recording removes any doubt about whether Alvarado's waiver was made knowingly and intelligently. Indeed, the video recording completely undermines all arguments to the contrary. Unlike so many other cases in which a contest of credibility takes place between a defendant, with his allegations

of coercive police conduct, and a police officer, offering absolute denials of any impropriety, here the video speaks for itself.

Despite Alvarado's assertion to the contrary, it is clear to us that Alvarado understood English, was acutely aware of the reason he was being questioned, and understood his rights. Finally, Alvarado diligently read and signed a Spanish *Miranda* rights waiver form after informing Det. Alboum that he could read Spanish. If there was any chance that Alvarado was unable to sufficiently understand his rights when they were explained to him in English, he certainly understood them in Spanish. *See Jimenez*, 33 A.3d at 736.

With respect to Alvarado's arguments concerning the alleged failure by the police to properly inform him of the exact crimes for which he was being investigated, we see no merit. Although the police should inform a suspect of the reason he is being questioned, any failure to inform a suspect of the crimes for which they have been arrested "does not automatically require a finding of involuntariness[.]" *State v. Forbes*, 900 A.2d 1114, 1119 (R.I. 2006). Instead, such a failure is but one factor, among many factors, for the court to consider to determine whether or not a statement was voluntarily provided. *Id.* As the United State Supreme Court has said, a "valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might affect his decision to confess.'" *Id.* (brackets and deletions omitted) (quoting *Colorado v. Spring*, 479 U.S. 564, 576 (1987)).

Moreover, it is undisputed that both *Miranda* rights forms made clear to Alvarado that he was being questioned because he was a suspect in the crime of sexual assault. Alvarado was also informed orally on at least three separate occasions that he was being questioned because he was a suspect in the crime of sexual assault. Although the police did not specifically mention at the start of the interview that they were also inquiring about first-degree child molestation sexual

assault, it is clear that Alvarado knew that his sexual conduct with Meghan, and Meghan's age at the time it occurred, was the reason that he was being interviewed.

After thoroughly reviewing the record, we unhesitatingly conclude that Alvarado's waiver of his *Miranda* rights was made knowingly, intelligently, and voluntarily, and therefore the trial justice properly denied his motion to suppress.

**B**

**Motion for Mistrial Based on Alleged Discovery Violation**

Alvarado next argues that the trial justice erred when she denied his motion for a mistrial. He asserts that the trial justice should have granted his motion because of a Rule 16 discovery violation by the state. As discussed *supra*, at trial, Ortega, Meghan's mother, testified that, when Alvarado traveled to Guatemala, he had asked for Meghan's hand. When she was asked what she meant by that statement, Ortega responded that Alvarado had asked for permission to marry Meghan, who was thirteen years old at the time. However, the state's responses to Alvarado's Rule 16 discovery request prior to trial, which included a copy of the transcript of Ortega's interview, did not indicate that Ortega would testify about Alvarado's request to marry Meghan nor did the state investigate further as to what Ortega meant when she said Alvarado "asked for [Meghan]'s hand." Therefore, Alvarado argued that Ortega's testimony in this respect was "surprise testimony."

**1**

**Standard of Review**

"It is well established that, when this Court reviews questions regarding claimed Rule 16 discovery violations, the applicable standard is narrow: The trial justice must have committed clear error." *State v. Adams*, 161 A.3d 1182, 1197 (R.I. 2017) (brackets omitted) (quoting *State v.*

- 13 -

*Santiago*, 81 A.3d 1136, 1139 (R.I. 2014)). "Therefore, because the trial justice is in the best position to determine whether any harm has resulted from alleged noncompliance with discovery motions, we will not disturb a trial justice's ruling on claimed Rule 16 violations absent a clear abuse of discretion." *Id.*

## 2

### Analysis

"It is well settled that Rule 16 requires that discovery be made in a timely manner in order that defense counsel may marshal the information contained in the discovery material in an orderly manner." *State v. Rivera*, 221 A.3d 359, 369 (R.I. 2019) (quoting *State v. Rosado*, 139 A.3d 419, 424 (R.I. 2016)). "When a trial justice is confronted with an alleged discovery violation, he or she 'should examine four factors: (1) the reason for the nondisclosure; (2) the prejudice to the other party; (3) whether or not a continuance can rectify any such prejudice; and (4) any other relevant factors." *Id.* (quoting *Rosado*, 139 A.3d at 424).

After reviewing the record, we conclude that the trial justice acted within her discretion when she denied Alvarado's motion for a mistrial. The trial justice properly alleviated any possible prejudice in this jury-waived trial by granting Alvarado a five-day continuance. We see no reason why that continuance could not have overcome any prejudice which may have arisen from the state's failure to inform Alvarado that Ortega would have revealed that Alvarado had told her that he wished to marry her thirteen-year-old daughter.

Alvarado's argument focuses on the importance of any evidence of the prior relationship of the parties and the timing of when his relationship with Meghan began. He argues that evidence that he had asked for permission to marry Meghan when she was thirteen years old significantly strengthened the state's case, because that evidence demonstrates that Alvarado and Meghan's

relationship was intended to be sexual from the very start. However, Alvarado was on notice of Ortega's interview statement that she had authorized him to live with Meghan when she was a minor in the United States "as a couple[,]" which included what she imagined would be relations, and that she had told all her daughters "what it's like to be with a man." Also, Alvarado's argument fails to address the other evidence that indicates that his relationship with Meghan was by no means platonic from its very beginning. Not only did Meghan's testimony, which the trial justice found to be credible, make this fact clear, but Alvarado's own statements to the police and the fact that Meghan gave birth at age fifteen removes any doubt. In light of that other evidence, it is apparent that Ortega's testimony regarding Alvarado's request to marry Meghan was merely a proverbial drop in the bucket. Therefore, we discern no error in the trial justice's denial of the motion.

## C

## Motion to Dismiss

Finally, Alvarado argues that the trial justice erred when she credited Meghan's testimony in denying defendant's Rule 29(b) motion to dismiss the first two counts of the indictment relating to first-degree child molestation sexual assault, but discredited her testimony when she granted defendant's motion as to the third and fourth counts, relating to first-degree sexual assault. Alvarado argues that the trial justice's parsing of the credibility of the complaining witness was arbitrary and not based on any relevant or material facts.

## 1

## Standard of Review

"In a jury-waived criminal proceeding, a defendant may move to dismiss [pursuant to Rule 29(b)] in order to challenge the legal sufficiency of the evidence." *State v. Berroa*, 6 A.3d 1095, 1099 (R.I. 2010) (quoting *State v. Harris*, 871 A.2d 341, 346 (R.I. 2005)). "In ruling on such a

- 15 -

motion, the trial justice acts as the fact-finder." *Id.* at 1099-100 (quoting *Harris*, 871 A.2d at 346). "In carrying out that task, the trial justice is required to weigh and evaluate the trial evidence, pass upon the credibility of the trial witnesses, and engage in the inferential process, impartially, not being required to view the inferences in favor of the nonmoving party, and against the moving party." *Id.* at 1100 (quoting *Harris*, 871 A.2d at 346). "The trial justice must deny the defendant's motion to dismiss if he or she concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt." *Id.* (quoting *Harris*, 871 A.2d at 346).

"We employ a deferential standard of review to a trial justice's decision on a defendant's Rule 29(b) motion." *State v. Perry*, 182 A.3d 558, 572 (R.I. 2018). "This Court will uphold the findings of a trial justice presiding over a criminal bench trial unless it can be shown that he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *Id.* (brackets omitted) (quoting *Berroa*, 6 A.3d at 1100).

## 2

### Analysis

Our review of the record reveals that the trial justice conscientiously conducted a Rule 29(b) analysis by setting forth the relevant law, discussing the evidence, and making credibility determinations about the witnesses. We see no reason that would lead us to a conclusion that the trial justice erred.

The trial justice's decision on the motion to dismiss centered on distinguishing the credibility of Meghan's testimony regarding Alvarado's sexual assault upon her when she first arrived in Rhode Island at age thirteen from her credibility with respect to the sexual assaults that she alleged had occurred later. As to those later allegations, the trial justice found that Meghan's testimony was not credible with respect to force or coercion. The trial justice found that Meghan

- 16 -

had a motive to embellish certain elements of her relationship with Alvarado because of the acrimonious nature of their child custody dispute, as well as her application for immigration status. However, as to the first-degree child molestation sexual assault charges, the trial justice determined that Meghan's testimony was more credible and that it was corroborated by additional facts. Those facts included the statements Alvarado made to detectives during his interview, in which Alvarado had been evasive when answering questions about Meghan's age; the fact that Meghan gave birth at age fifteen; and, finally, Ortega's testimony regarding the circumstances surrounding Alvarado's request to marry Meghan. All those facts, in the trial justice's view, fully supported Meghan's credibility as to the two charges of first-degree child molestation sexual assault.

We see no reason to disagree with the trial justice's deliberate and thorough review of the evidence. The trial justice had solid ground to distinguish between credible and incredible testimony from the complaining witness. We see no merit in Alvarado's contention that the trial justice arbitrarily distinguished between what was credible and what was not credible with respect to Meghan's testimony regarding the purpose and circumstances surrounding her travel to the United States and the fact that Alvarado had sexual intercourse with her in those first days in Rhode Island and thereafter regularly, and the allegations of force or coercion that occurred on later dates. Determining credibility is within the province of the trial justice, and we conclude that she discharged her duty appropriately.

### III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record shall be returned to that tribunal.

- 17 -

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Edilsar Alvarado. |
| **Case Number** | No. 2018-191-C.A. (P1/15-3394A) |
| **Date Opinion Filed** | June 30, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General |
| | For Defendant:<br><br>George J. West, Esq. |