July 9, 2025

**Supreme Court**

No. 2022-35-C.A.
(P2/17-1841ADV)

State            :

v.             :

Joseph Coletta.       :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State               :

v.                :

Joseph Coletta.        :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Long, for the Court.** The defendant, Joseph Coletta (Mr. Coletta or defendant), appeals from a Superior Court judgment of conviction following a jury trial at which he was found guilty of five counts of second-degree child molestation. On appeal, the defendant argues that the trial justice erred in (1) denying his motion to suppress his post-arrest statement to police because it was obtained in violation of the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and article 1, section 2 of the Rhode Island Constitution; (2) denying his motion to suppress his post-arrest statement to police because it was obtained in violation of Rule 5(a) of the District Court Rules of Criminal Procedure; (3) granting the state's motion *in limine* to preclude the defendant's false-confessions expert from testifying; and (4) denying the defendant's motion for a new trial. For the reasons stated herein, we affirm the judgment of the Superior Court.

- 1 -

## Facts and Procedural History

On January 13, 2017, the Rhode Island State Police (the state police) arrested Mr. Coletta pursuant to a warrant after receiving a complaint that he had engaged in various instances of child molestation involving A.R., the complaining witness.[1] The state police took Mr. Coletta to the state police barracks at approximately 8 a.m. and interviewed him about A.R.'s allegations; during the interview, defendant acknowledged various instances of sexual contact with A.R.

The state police presented Mr. Coletta at the District Court later that day. Thereafter, on July 11, 2017, the state filed a ten-count criminal information in Providence County Superior Court charging defendant with eight counts of second-degree child molestation in violation of G.L. 1956 § 11-37-8.3 and § 11-37-8.4; one count of intimidation of a witness or victim of a crime in violation of G.L. 1956 § 11-32-5(a) and § 12-29-5; and one count of intimidation of a witness or victim of a crime in violation of § 11-32-5(a).

Prior to trial, defendant filed a motion to suppress all statements made to the state police on January 13, 2017, during his post-arrest interview. The defendant asserted that the length of his interrogation and the conduct of the state police officers who conducted the interrogation rendered his confession involuntary and,

---

[1] We refer to A.R. by her initials because she was a minor at the time the alleged molestations occurred. A.R. was an adult at the time of trial.

therefore, its admission at trial would violate defendant's rights under the Due Process Clause of the Fourteenth Amendment. Furthermore, defendant asserted that, after his arrest pursuant to a valid arrest warrant, the police unnecessarily delayed defendant's presentment to the District Court, in violation of Rule 5(a) of the District Court Rules of Criminal Procedure. He claimed that he remained in state police custody for six hours and that the state police officers interrogated him for four and a half hours before presenting him to a neutral judge in the District Court. The defendant argued that this unnecessary delay in presentment was "clearly causative of [his] confession."

The defendant also disclosed his intention to call Brian L. Cutler, Ph.D., as a witness at trial. The defendant provided Dr. Cutler's curriculum vitae and stated that Dr. Cutler would testify "about topics such as the link between false confessions and wrongful convictions" among other subjects. The state filed a motion *in limine* seeking to exclude expert testimony by Dr. Cutler regarding false confessions. The state argued that Dr. Cutler's testimony ran the risk of impeding the jury's function of determining the trustworthiness and the reliability of the evidence and that Rhode Island courts have yet to allow admission of the type of testimony defendant sought to introduce.

A justice of the Superior Court held a hearing on the parties' motions on January 13, 2020. The trial justice stated at the outset that she had reviewed both

- 3 -

the transcript and the video of the post-arrest interview and determined that she would not permit any references to a polygraph examination that defendant had taken during the post-arrest interview. The defendant declined to present additional evidence, asserting that the video spoke for itself.

The trial justice found that defendant was a college-educated man, articulate, and sufficiently mature. She also found that defendant was given his *Miranda*[2] rights but nonetheless agreed to speak with the police in an attempt to "convince the officers of his innocence by being very cooperative * * *." She found that the conduct of the state police was less coercive than that of the police in *State v. Munir*, 209 A.3d 545 (R.I. 2019). She noted that Mr. Coletta was not handcuffed, unlike the defendant in *Munir*, where the police "were much more bullying[.]" The trial justice concluded that defendant made a knowing, intelligent, and voluntary waiver of his rights and further that the four-and-a-half-hour length of the interrogation did not negate the voluntariness of his statement. Notwithstanding the trial justice's finding that the statement was voluntary, she nevertheless directed the parties to work together to redact references in the interview to the polygraph examination and conditionally denied the motion to suppress accordingly.

The trial justice then addressed the state's motion *in limine* to preclude the testimony of defendant's proffered expert, Dr. Cutler, from testifying about false

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

confessions. Defense counsel argued that Dr. Cutler would testify about general practices used by police interrogators, the impact of those techniques and tactics on a person under interrogation, and how those techniques and tactics could lead to a false confession. The state asserted that, despite defendant's stated limits on what Dr. Cutler would testify to, his testimony "as a whole" would serve as impermissible vouching or bolstering of defendant's testimony.

The trial justice granted the motion *in limine*, reasoning that effective cross-examination of the police would elicit testimony about the conditions of defendant's interrogation. She also determined that the expert testimony that defendant wished to introduce would invade the province of the jury and be inconsistent with Rhode Island caselaw prohibiting one witness from testifying to another witness's credibility.

On January 16, 2020, a jury trial commenced on counts 1 through 8.[3] The state presented three witnesses in its case-in-chief: A.R.; Mara Olink; and Detective Connor O'Donnell (Det. O'Donnell).

A.R. became acquainted with defendant when she was four years old, after her mother began dating and moved in with defendant. The defendant later fathered A.R.'s younger siblings.

---

[3] The state dismissed counts 9 and 10, the charges related to intimidation of a witness or victim of a crime, in an amended criminal information before trial.

At trial, A.R. recalled several instances in which defendant had fondled her, asked her to perform oral sex, or otherwise made her feel uncomfortable. The first incident A.R. detailed occurred in Providence in 2009 when she was eight years old (count 1). She testified that she was sitting on a chair across from defendant in the living room of their apartment when he called her over to sit with him. A.R. found defendant's invitation to be "weird" because he was "usually not gentle towards [her]. He was always * * * aggressive and it was very out of character." A.R. nevertheless obliged, she testified, and defendant proceeded to rub her legs and thighs.

A.R. testified to a second incident (count 2) immediately after the first in which defendant told A.R. that they were going somewhere, "like to the park." A.R. testified that defendant took her to a parking lot near a woodsy area not too far from their home. While parked in the parking lot, A.R. testified that defendant told her to pull her pants down and then proceeded to touch her genital area with his fingers. The inappropriate touching lasted for a few minutes, she recalled, before they exited the car and moved to another area.

A.R. testified that defendant led her to the woodsy area nearby and touched her inappropriately again (count 3). She provided detail about the location of this event, including that she remembered climbing up a steep rock surrounded by a lot of trees and vegetation. Once there, A.R. testified that defendant told her to undress

again and he also undressed this time. She stated that she pulled her pants and underwear down to her ankles and defendant put her hands on his genitals. She described feeling very uncomfortable and very scared. A.R. recalled that defendant asked her to perform oral sex on him, but she started crying and was too frightened. Once they arrived home, A.R. did not tell her mother what had occurred because she was afraid of defendant, who she testified was "very physically abusive [and] verbally abusive towards me and my whole family." She ultimately told her mother about the third incident over a year later because he no longer lived in their home and she felt safe enough to disclose it.

A.R. testified that, on July 4, 2012, defendant touched her a fourth time (count 4). She testified that she was sitting on the futon in their living room when defendant, who was sitting behind her, briefly touched her back and the top of her buttocks under her clothing with both of his hands. A.R. testified that she did not tell her mother about this fourth incident because "the first time I told her something happened, she dismissed me and moved back in with him and told me to keep quiet."

Also on a summer day in 2012, A.R. explained that defendant took her to Lincoln Woods in Lincoln, Rhode Island, after she agreed to go fishing with him, but once they arrived, they began discussing trying to find a secluded area where A.R. "could do stuff to him, like the touching" (count 5). A.R. stated that they walked around Lincoln Woods for no more than an hour before returning to the car

and driving to a golf course. During the ride, A.R. testified that defendant released the button of his pants and told her to touch his genitals, which she did (count 6). Upon arriving at the golf course, A.R. testified, she remembered defendant parking next to a gate or a fence, asking her to pull her pants down, exposing himself, and propositioning her to grab his genitals. A.R. also testified that defendant touched her buttocks after she pulled her pants down. She testified that defendant again tried to get her to perform oral sex on him but she refused. A.R. recalled feeling very upset and angry and that she expressed wanting to leave.[4]

The final incident A.R. recalled (count 8) occurred the day before she started sixth grade. A.R. testified that she fell asleep that evening in bed with her mother and sister and remembered waking up to the feeling of someone "groping [her] butt" with their hands. She recalled that it was "pitch black," but that she remembered the feeling of the touching sensation that night from prior instances in which defendant had assaulted her. A.R. testified that defendant did not say anything to her during this incident.

A.R. testified that she was referred to counseling at some point between 2012 and 2013 after she began exhibiting self-injurious behaviors, behaviors concerning her treatment of animals, and difficulty in her interactions with her mother and sister.

---

[4] At the close of evidence, the state dismissed count 7 of the criminal information pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

A.R. testified that she was assigned to a therapist named Mara Olink and that, during either their first or second session together, she told Ms. Olink a few details about the first alleged assault. A.R. testified that she only discussed a few details because she felt very uncomfortable talking about "that kind of subject matter" and she wanted to see what Ms. Olink would do with the little information she provided.

A.R. testified that she later recanted the allegations, but then came forward again in 2016 after realizing that her decision to recant had a very negative effect on her mental health. A.R. also testified that she was motivated to re-report the incidents because she was concerned that defendant would come back into her life after her mother became pregnant with his child in 2016. She testified that she had initially recanted to "keep everybody else happy * * *." A.R. stated that Ms. Olink accompanied her to the appropriate municipal police stations to re-report the allegations.

On cross-examination, defense counsel queried A.R.'s memory of the assaults and details about her police reports, primarily regarding her recall of whether her mother was present during her police reports and whether her report to the Providence police occurred at her home or at the police department. A.R. acknowledged that "details are quite fuzzy" and her "timeline * * * was very hazy" because three of the incidents happened close in time to one another. Defense counsel also asked A.R. about the recanting of her accusations, and A.R.

acknowledged that she had, at that time, expressed feeling bad about "blaming" defendant.

Defense counsel further elicited on cross-examination that A.R.'s mental health struggles began in 2006, years prior to when the sexual assaults allegedly occurred. A.R. additionally testified that she did not appreciate how defendant treated her mother, that defendant was abusive, that she had witnessed several arguments between her mother and defendant, and that she wanted defendant out of the home.

Ms. Olink, A.R.'s licensed clinical social worker, testified that she began treating A.R. in 2013 after reports of A.R.'s struggles with depression and concerns that she had been engaging in unsafe and self-injurious behaviors. Ms. Olink testified that during their first session, A.R. reported that she had suffered physical, emotional, and sexual abuse by defendant. Specifically as to the sexual abuse, Ms. Olink testified that A.R. reported the details of the incident in the woodsy area near the park where, when she was eight years old, defendant reportedly took A.R. into the woods, pulled her underwear down, touched her genital region, and had her touch his genitals as well. Ms. Olink further testified that A.R. disclosed four other incidents wherein defendant sexually assaulted her. Ms. Olink testified that, in 2016, A.R. shared that the time period after her decision to recant was the worst time of

her life; A.R. also stated that she wanted to "take her control back and move forward and report the sexual abuse."

Next, Det. O'Donnell, a detective in the major crimes unit of the Rhode Island State Police, testified about his involvement in the investigation into A.R.'s allegations against defendant. After A.R. reported the allegations, Det. O'Donnell testified that he obtained an arrest warrant for defendant and took him into custody. Detective O'Donnell testified that, once defendant was in his police cruiser, he advised defendant of his *Miranda* rights. He testified that defendant responded that he wished to speak with Det. O'Donnell and stated something along the lines of wanting to provide his account of what happened. Detective O'Donnell testified that he took defendant to police headquarters instead of directly to court because it is common practice to first complete the booking process. He stated that, in cases where there is an investigation ongoing, it is customary to offer the defendant the opportunity to give an interview or statement before bringing them to court.

Once they arrived at the police station, Det. O'Donnell testified, he took defendant to a holding facility where he asked again if defendant wanted to provide a statement, which defendant agreed to. Detective O'Donnell subsequently took defendant to an interview room, which he described as having four walls with a fixed silver table in the middle, a few chairs, and a one-way mirror. Detective O'Donnell testified that he, a special agent from the FBI, and then-state police detective, now

Corporal Herbert Tilson (Cpl. Tilson) conducted the interview with defendant. Detective O'Donnell testified that defendant was informed of his *Miranda* rights again in the interview room and defendant signed a form waiving his rights. He testified that the interview lasted for approximately four and a half hours, during which time defendant did not ask to speak with an attorney or ask to stop speaking with police.

Detective O'Donnell testified about the details of the interview, stating that defendant initially denied having sexual contact with A.R. but that defendant also changed his position throughout the interview. Detective O'Donnell testified that he did not threaten or make physical contact with defendant nor did he observe anyone else doing so, at any point during the interview. Toward the end of the detective's direct examination, the state played video excerpts of defendant's interview to the jury.

On cross-examination, Det. O'Donnell agreed with defense counsel that defendant denied the allegations many times throughout his interview.

The state rested and defendant moved for a judgment of acquittal on counts 4, 5, and 8 pursuant to Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure. The trial justice granted the motion as to count 5 but denied the motion as to counts 4 and 8.

The defendant then testified as the only witness in his case-in-chief. He testified that A.R. caused problems in his household from the moment she and her mother moved in with him. When they moved to North Providence, he testified that things with A.R. became out of control and she became destructive of their apartment.

The defendant also testified that on the day of his arrest, he was taken into custody around 8 a.m. and transported by police cruiser to the state police barracks, where he remained in a cell for a few hours. The defendant testified that he was very scared and nervous during the interview, and that he confessed to the allegations because he kept telling the police "no" and they would not accept "no" as an answer.

On cross-examination, defendant stated that he did not remember being advised of his *Miranda* rights and that he never told police he wanted to speak with them during the ride to the police station. He testified that, once he arrived at the police station, he agreed to speak with police. The defendant acknowledged that he was advised of his *Miranda* rights at that point and signed a form waiving his rights. The defendant admitted that he initiated discussion of a lawyer during the interview, but when asked directly if he wanted one, he declined and stated, "I'm telling you guys the truth. I don't want none of that stuff." The defendant agreed that he admitted during his interview that A.R. had, on three separate occasions, allegedly touched his genitals with her foot when she walked over him while he was seated on

- 13 -

the floor, grabbed his genitals in the kitchen of their home (kitchen incident), and fondled his genitals in the car while defendant was driving (car incident). The defendant testified that the interviewers yelled at him most of the time but that he never asked to stop the interview.

On redirect examination, defendant testified that he agreed to speak with police because he had nothing to hide and he did not ask for an attorney because he did not think he did anything wrong. He testified that, during the interview, Cpl. Tilson leaned over the metal table and was grinding his teeth as if he was going to jump out at defendant. He also provided a different narrative of the kitchen incident than what he admitted to in his interview and during cross-examination: Defendant testified that he walked by A.R. in the kitchen and she stuck her hand out and flicked his genitals, but she did not grab it. As to the car incident, he explained that while he was driving A.R. to her father's house, she slipped her hand into his shorts and grabbed his genitals; he grabbed her hand and pushed it away.

Corporal Tilson testified as a rebuttal witness for the state and explained how he assisted in the interview of defendant. He testified that he raised his voice at defendant at times during the interview, but that he never physically threatened defendant, leaned over the table in a threatening manner at him, or grinded his teeth at him.

At the close of the evidence, defendant renewed his motion for a judgment of acquittal on counts 4 and 8. The trial justice denied the motion as to both counts.

After closing arguments, the trial justice instructed the jury, including as follows with respect to defendant's post-arrest interview statements while in police custody:

> "[Y]ou may not consider those statements in your deliberations unless you're satisfied by clear and convincing evidence that the [d]efendant had been advised of certain [c]onstitutional rights, commonly known as one's Miranda [r]ights, before he made the statements.
>
> "* * *
>
> "[I]n addition, did they demonstrate to you that the [d]efendant was advised of those rights? The state has to prove from the totality of the circumstances by clear and convincing evidence that the [d]efendant understood those [r]ights and that he or she voluntarily waived those [r]ights in an intelligent manner without threats or force [from] the police."

The jury returned a guilty verdict on counts 1 through 4 and 6 and a verdict of not guilty on count 8. Mr. Coletta filed a motion for a new trial, arguing that the verdict was against the weight of the evidence. The trial justice denied the motion for a new trial and subsequently sentenced defendant to a term of incarceration of twenty-five years with eighteen years to serve and the balance of time suspended, with probation. A judgment of conviction entered thereafter and defendant filed a timely notice of appeal.

- 15 -

## Discussion

The defendant argues on appeal that the trial justice erred in (1) denying his motion to suppress his post-arrest statement to police because it was obtained in violation of the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and article 1, section 2 of the Rhode Island Constitution; (2) denying his motion to suppress his post-arrest statement to police because it was obtained in violation of Rule 5(a) of the District Court Rules of Criminal Procedure; (3) granting the state's motion *in limine* to preclude testimony from Dr. Cutler; and (4) denying the defendant's motion for a new trial.

## Motion to Suppress

This Court employs a two-step analysis when reviewing a trial justice's decision to grant or deny a motion to suppress a statement alleged to have been made involuntarily: (1) we review the trial justice's findings of historical fact for clear error; and (2) if the trial justice's findings of historical fact are not clearly erroneous, we apply those historical facts and review *de novo* the trial justice's decision regarding the voluntariness of the statement. *State v. Munir*, 209 A.3d 545, 550-51 (R.I. 2019); *State v. Dennis*, 893 A.2d 250, 261 (R.I. 2006) ("[T]he ultimate question of whether a confession was given voluntarily is legal in nature, and 'this Court undertakes a *de novo* review of questions of law and mixed questions of law and fact

insofar as those issues involve constitutional issues.'") (quoting *State v. Page*, 709 A.2d 1042, 1044 (R.I. 1998)).

## 1. Due-Process Violation

Mr. Coletta first argues that the trial justice erred in denying his motion to suppress his statement because the confession was obtained in violation of his due-process rights under the Fourteenth Amendment to the United States Constitution and article 1, section 2 of the Rhode Island Constitution. Specifically, defendant contends that the police subjected him to a long interrogation in an isolated room at the police station and "overbore his will" with threats of harsh punishments, deception, and retaliation. The totality of the circumstances, he asserts, demonstrates that he was coerced and improperly induced into confessing.

It is clear from the record that Mr. Coletta did not challenge the post-arrest interview statement on state constitutional grounds in the Superior Court. We will not review on appeal what the trial justice has not had the opportunity to consider in the first instance. *State v. Ciresi*, 45 A.3d 1201, 1212 (R.I. 2012). We will therefore consider Mr. Coletta's due-process argument under the Fourteenth Amendment to the United States Constitution only.

Evaluating whether a defendant's statement was made consistent with the mandates of due process requires the trial justice to determine whether the state proved, by clear and convincing evidence, that the defendant knowingly,

intelligently, and voluntarily waived his *Miranda* rights. *State v. Sabourin*, 161 A.3d 1132, 1142 (R.I. 2017). A statement was made voluntarily when it was the product of defendant's free will and rational choice; a statement was made involuntarily when it was extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes defendant's free will. *State v. Garcia*, 140 A.3d 133, 140 (R.I. 2016). Assessing voluntariness requires an analysis of the totality of the circumstances in each given case. *Sabourin*, 161 A.3d at 1142. In conducting this analysis, among the relevant considerations are "the background, experience and conduct of the accused, as well as the level of a suspect's educational attainments." *State v. Gouin*, 182 A.3d 28, 34 (R.I. 2018) (quoting *State v. Bojang*, 138 A.3d 171, 181 (R.I. 2016)). "[A]bsent evidence that [the] defendant's will was overborne and his capacity for self-determination critically impaired because of coercive police conduct, his waiver was voluntary under *Miranda*." *Munir*, 209 A.3d at 552 (brackets and deletions omitted) (quoting *State v. Jimenez*, 33 A.3d 724, 734 (R.I. 2011)).

We also evaluate a defendant's challenge to the voluntariness of her or his statement according to the Humane Practice Rule. *Dennis*, 893 A.2d at 261-62. "The Humane Practice Rule requires that judge and jury make separate and independent determinations of voluntariness—and the defendant's statement may not serve as a

- 18 -

basis for conviction unless both judge and jury determine that it was voluntarily made." *Id*. at 262 (emphasis omitted).

The record in this case supports the conclusion that Mr. Coletta made his post-arrest interview statement knowingly, intelligently, and voluntarily, notwithstanding the four-and-a-half-hour length of the interrogation. The trial justice reviewed the video and transcript in their entirety—the extent of the evidence presented—and found that Mr. Coletta was advised of his *Miranda* rights; that he appeared to be an intelligent, articulate, sufficiently mature, college-educated man; that he agreed to speak with the police without an attorney present; that he was not handcuffed; and that although the interrogation was somewhat exhausting and not pleasant, it was not enough to negate the voluntariness of his statement.

We are satisfied that the trial justice's findings of fact were not clearly erroneous, and therefore we afford those findings great deference. *State v. Barros*, 24 A.3d 1158, 1179 (R.I. 2011).

The totality of the circumstances reveals that Mr. Coletta knowingly and intelligently waived his *Miranda* rights. He is an intelligent and educated man who was advised of his *Miranda* rights and who subsequently signed a form waiving those rights, which demonstrates that he had the "capacity and knowledge to understand what he was doing." *State v. Marini*, 638 A.2d 507, 513 (R.I. 1994).

Moreover, the totality of circumstances also supports the conclusion that the conduct of the state police was not so coercive as to have overcome Mr. Coletta's will and capacity for self-determination. *See Munir*, 209 A.3d at 552. Although the interviewers raised their voices at times when clarifying their questions to defendant, leading to an unpleasant and somewhat exhausting interrogation, there is an absence of evidence of threats, violence, or undue influence. *See id*. at 554 (determining that "significant level of vulgarity, raised voices, and a barrage of questions" did not amount to grounds for suppression); *Garcia*, 140 A.3d at 140.

Finally, related to the trial justice's evaluation of the voluntariness of Mr. Coletta's post-arrest interview statement, we acknowledge also that the jury made a separate and independent determination of the voluntariness of the statement, pursuant to the instructions of the trial justice. *See Dennis*, 893 A.2d at 262. We perceive no error in the decision of the trial justice to deny defendant's motion to suppress his post-arrest interview statement as having been obtained in violation of his due-process rights. Furthermore, we are assured by the procedural safeguard that the Humane Practice Rule provided to defendant in this case.

## 2. Violation of Rule 5(a) of the District Court Rules of Criminal Procedure

The defendant argues that the delay by the state police in presenting him before a judge of the District Court was unreasonable and unnecessary in violation of Rule 5(a) of the District Court Rules of Criminal Procedure and warranted

suppression of his confession.  He asserts, in a conclusory statement, that the "delay was causative of his confession."

Rule 5(a) provides, in pertinent part, that "an officer making an arrest under a warrant issued upon a complaint shall take the arrested person without unnecessary delay before a judge of the District Court" for a prompt bail hearing. Dist. R. Crim. P. 5(a).  However, our well-settled caselaw is clear that a defendant who seeks to have his statement excluded because of a violation of Rule 5(a) must demonstrate that the delay was unnecessary and that such delay caused the defendant to give a confession. *State v. King*, 996 A.2d 613, 622 (R.I. 2010).

We are unpersuaded by defendant's conclusory argument that the delay in presenting him to the District Court "was causative of his confession."  Our review of the record in this matter leads us to conclude that defendant failed to meet his burden. *See King*, 996 A.2d at 623 n.18 ("It is important to distinguish between the *occasion* for an occurrence and the *cause* for an occurrence. The mere fact that an event (e.g., an incriminating confession) occurs within a period of delay does not mean that the delay necessarily *caused* that confession * * *.").  Moreover, the recognized goal of Rule 5(a), which is substantially similar to its federal counterpart, is to minimize the police's opportunity to obtain confessions in violation of important rights, such as the right against self-incrimination, by ensuring that the arrested person is provided with an adequate statement of his constitutional rights as

- 21 -

soon as possible after arrest. 1 Charles Alan Wright & Andrew D. Leipold, *Federal Practice and Procedure: Criminal* § 71 at 153 n.4 (4th ed. 2008); *see also State v. Nardolillo*, 698 A.2d 195, 199 (R.I. 1997).  Here, we are satisfied that Rule 5(a)'s priority was met because defendant acknowledged that he was advised of his *Miranda* rights, that he declined to speak with a lawyer, and that he consented to speaking with police.

Accordingly, we conclude that the trial justice did not err in denying defendant's motion to suppress his post-arrest interview statement as obtained in violation of Rule 5(a).

### Motion *in Limine* to Preclude Expert Testimony

When reviewing a trial justice's decision concerning the admissibility of expert testimony, this Court will not reverse the decision save for an abuse of discretion. *State v. Gaspar*, 982 A.2d 140, 153-54 (R.I. 2009).  This Court will sustain the trial justice's decision if the trial justice's discretion was "soundly and judicially exercised," meaning that "it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties * * *." *Id*. at 154 (quoting *In re Mackenzie C.*, 877 A.2d 674, 684 (R.I. 2005)).

The defendant argues that the trial justice erred in granting the state's motion *in limine* to exclude defendant's expert witness on false confessions, Dr. Cutler, because the trial justice applied an incorrect legal standard and failed to conduct a

hearing on the admissibility of such evidence pursuant to Rules 702 and 403 of the Rhode Island Rules of Evidence. He relies on *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995), for the proposition that expert testimony should not be automatically excluded simply because that testimony concerns a credibility question. *See Shay*, 57 F.3d at 131.

Rule 702 allows a witness qualified as an expert to testify in the form of a fact or an opinion if her or his scientific, technical, or other specialized knowledge would assist the trier of fact in understanding the evidence or determining a fact in issue. R.I. R. Evid. 702. This Court has not evaluated the admissibility of expert testimony relating to false confessions. *See Barros v. State*, 180 A.3d 823, 832 (R.I. 2018) (noting that this Court has not addressed the admissibility of false-confession expert testimony and that courts are divided about this issue). However, Rhode Island law is generally clear that no witness, expert or otherwise, may testify that another witness is lying because determining the truthfulness or credibility of a witness is a function reserved for the jury. *State v. Miller*, 679 A.2d 867, 872 (R.I. 1996); *State v. Lassiter*, 836 A.2d 1096, 1107 (R.I. 2003); *State v. Adefusika*, 989 A.2d 467, 476 (R.I. 2010); *State v. Richardson*, 47 A.3d 305, 314 (R.I. 2012); *State v. Gaudreau*, 139 A.3d 433, 447 (R.I. 2016). This is the case even when the witness's opinion "does not literally state an opinion concerning the credibility of another witness's testimony" because that testimony could have the same "substantive import" as

testimony that literally addressed another witness's credibility. *Lassiter*, 836 A.2d at 1107.

Furthermore, we have previously held that, before a trial justice schedules an evidentiary hearing on the admission of expert testimony, the party seeking to introduce expert testimony "must alert the court to the nature of the evidence to be presented through affidavits or other offers of proof." *State v. Werner*, 851 A.2d 1093, 1100 (R.I. 2004). However, evidentiary hearings are not mandated in every case. *Roe v. Gelineau*, 794 A.2d 476, 483 (R.I. 2002). Rather, the party seeking admission of the testimony must alert the trial justice that scientific or medical evidence is at issue and make a threshold showing that the evidence is derived from a valid scientific theory. *Id*.

Our review of the record and relevant caselaw reveals that the trial justice did not abuse her discretion in granting the state's motion *in limine* to preclude Dr. Cutler from testifying about false confessions.

Beyond proffering that Dr. Cutler would testify about "psychological reactions to interrogation" and submitting Dr. Cutler's curriculum vitae, defendant made no other showings to alert the trial justice that scientific or medical evidence was at issue. *See Werner*, 851 A.2d at 1099-1101 (concluding that the defendant's proffer of expert's curriculum vitae, that expert would testify about issues involving psychiatry, memory of trauma, unreliability of eyewitness identifications, certain

specific psychological theories, and a study regarding an eyewitness's confidence in her testimony was not sufficient to alert the trial justice to a specific theory that required expert explanation).  In the absence of a threshold showing that scientific evidence was at issue, and in light of the fact that defendant was silent as to his need for an evidentiary hearing at the hearing on the state's motion *in limine*, we will not say that the trial justice abused her discretion. *Gelineau*, 794 A.2d at 483; *see Werner*, 851 A.2d at 1101 (holding that the trial justice was not required to prolong the judicial proceedings based on a few general statements about what the anticipated expert would testify to, none of which demonstrated that an expert was indeed required).

The defendant urges us to look to *Shay* for the notion that not all testimony concerning a witness's credibility should be automatically precluded.  Furthermore, he highlights that, in *Shay*, the court was unable to address the state's arguments regarding the exclusion of the expert testimony under Rule 403 because the lower court failed to hold an evidentiary hearing below, which the court determined was not harmless error. *Shay*, 57 F.3d at 134. The defendant's argument fails.

In *Shay*, the United States Court of Appeals for the First Circuit evaluated whether the trial court erred in precluding expert testimony about the defendant's mental disorder that may have caused him to make false statements about his own interests. *Shay*, 57 F.3d at 133.  And while defendant is correct that the court

determined that testimony concerning the credibility of a witness is not always inadmissible, the court did not express that the failure to conduct an evidentiary hearing was categorically erroneous, but instead, determined that the failure to do so on the particular trial record before it constituted prejudicial error. *Id*. at 134. Here, defendant's argument is wholly undercut by the fact that, dissimilar to the defendant in *Shay*, he failed to make a threshold showing that Dr. Cutler's testimony derived from scientific evidence. Accordingly, *Shay* is distinguishable and unconvincing in this case.

In rendering her decision, the trial justice noted the current jurisprudence on testimony concerning the credibility of a witness in Rhode Island, concluded that the proffered testimony would invade the province of the jury as factfinder, and reasoned that effective cross-examination of the police at trial would offer defendant the same desired effect. Based on her reasoning, the law of our state, and defendant's fatal failure to make a showing that Dr. Cutler's testimony derived from scientific evidence, we hold that the trial justice did not abuse her discretion in granting the state's motion.

## Motion for a New Trial

This Court reviews a trial justice's decision on a motion for a new trial with "great deference because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of

the witnesses." *State v. Valdez*, 267 A.3d 638, 644 (R.I. 2022) (quoting *State v. Acosta*, 247 A.3d 489, 494 (R.I. 2021)). "We consider whether the trial justice, acting as the thirteenth juror, exercised independent judgment in analyzing the evidence presented." *Id*. at 645. If the trial justice has conducted the appropriate analysis and articulated adequate reasoning for denying the motion, we will not disturb the decision unless she or he overlooked or misconceived material evidence or otherwise was clearly wrong. *Id*.

The defendant argues that the trial justice erred in denying his motion for a new trial because the verdict went against the fair preponderance of the weight of the evidence. The defendant contends that the trial justice erred in finding that the complaining witness was credible given her troubled past and clear issues with her testimony regarding places and times of the allegations.

Our review of the record reveals that the trial justice stated the standard applicable to a motion for a new trial, thoroughly evaluated the testimony of the witnesses, articulated her view of the video evidence as well as her credibility determinations, and ultimately conducted the appropriate analysis. She noted that A.R. was credible, sympathetic, and candid, while defendant did not appear credible and seemed to want to paint A.R. as a villain. The trial justice acknowledged that A.R. clearly had a difficult childhood and struggled with her mental health from a young age and prior to the alleged misconduct. The trial justice also recognized that

- 27 -

A.R. recanted her allegations at one point and discussed A.R.'s stated reasons for doing so. The trial justice also pointed to defendant's own admissions of sexual contact with A.R. in the interview video, and his statements that A.R. instigated the sexual contact. To the trial justice, such testimony was "very damaging to defendant." Finally, the trial justice determined that she would have come to the same conclusion as the jury in this case.

The defendant asserts that the trial justice erred in finding A.R. credible in light of her troubled past and inconsistencies regarding places and times of the alleged incidents. However, this Court has repeatedly held that a defendant's disagreement with the trial justice's credibility determinations is not a sufficient basis to warrant granting a new trial. *State v. Gonzalez*, 56 A.3d 96, 103 (R.I. 2012); *see also State v. Muralles*, 154 A.3d 925, 934 (R.I. 2017) (noting that a defendant who chooses to testify at trial runs the risk "that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth") (quoting *State v. Mattatall*, 603 A.2d 1098, 1109 (R.I. 1992)). Here, the trial justice acknowledged A.R.'s troubled past but found her credible anyway, which is her unique task as the person best situated to witness the "human drama that is part and parcel of every trial * * *." *State v. Paola*, 59 A.3d 99, 106 (R.I. 2013) (quoting *State v. DiCarlo*, 987 A.2d 867, 872 (R.I. 2010)). Moreover, inconsistencies in a complaining witness's testimony do not automatically render that testimony not credible. *State v. Lopez*,

149 A.3d 459, 465 (R.I. 2016).  In his papers, defendant does not point specifically to what aspects of A.R.'s testimony were inconsistent, but we are nevertheless satisfied that the trial justice's credibility determinations as a whole were well-reasoned and not clearly erroneous.

Therefore, because it is clear to us that the trial justice applied the appropriate standard, conducted the correct analysis, and did not otherwise clearly err, we affirm her decision denying the defendant's motion for a new trial.

## Conclusion

Therefore, we affirm the judgment of conviction and remand the record to the Superior Court.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Joseph Coletta. |
| **Case Number** | No. 2022-35-C.A. (P2/17-1841ADV) |
| **Date Opinion Filed** | July 9, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Sean P. Malloy<br>Department of Attorney General<br>For Defendant:<br><br>Stefanie DiMaio Larivee, Esq. |